# CASES DETERMINED

AT THE

# January Term, 1924.

GESSLER, Executrix, Appellant, vs. ERWIN COMPANY and
others, ·Respondents.

*March 8, 1923—January 15, 1924.*

*Patents: Exclusive license to manufacture and sell patented
article: Diligence: Independent or dependent covenants in
contract: Implied covenants: Abandonment of contract: Evi-
dence: Option to extend contract: Notice: Repudiation by one
party: Effect: Sale of licensor's interests: Trade-marks: Na-
ture of rights: Priority in use: In foreign countries: Confu-
sion in names.*

1. Where one who had been given an exclusive license to manu-
   facture and sell a patented article in foreign countries, and
   who had agreed to push its sale as diligently as conditions
   would permit, wrote numerous consuls and commercial at-
   tachés, obtained lists of possible customers from other sources,
   and began an extensive system of advertising, he exercised
   sufficient diligence, though sales were hampered by the war
   and other conditions. p. 329.
2. The licensor having agreed to prosecute and defend infringe-
   ment suits and otherwise to co-operate with the licensee, the
   covenants in the contract are not· so far independent that
   the licensee, to preserve his rights, was bound to continue
   attempts to perform after the licensor had repudiated the
   contract, transferred all its rights to another which had
   engaged in active competition with the licensee, and had for-·
   bidden the use of its designs, drawings, etc., in the manufac-
   ture of the article and otherwise interfered with the licensee.
   p. 336.
3. It· is an implied agreement by both parties to an exclusive
   license for the manufacture and sale of a patented article
   under which the licensee agrees to push the sale of the article
   that neither will do any act preventing or tending to prevent
   its performance. p. 337.

4. The licensee, in suing for specific performance, asked an injunction against interference with his sales and prosecuted the suit with diligence; but he was under no obligation to bring separate suits for injunction to enable him to continue performance of the contract pending the suit.    p. 339.

5. Abandonment of rights under a contract is purely a question of intent, and to establish the defense it is necessary to show not only acts indicating a practical abandonment but an actual intent to abandon.    p. 340.

6. Where the licensee could not, during pendency of the suit for specific performance, successfully continue his business relations with defendants because they refused to accept royalties or to co-operate with him and were actively resisting his efforts, but he tendered performance and kept the tender good, and in his complaint and on the final hearing offered to perform, there was no abandonment of the contract by him. p. 340.

7. The grant of an exclusive license to manufacture and sell a patented article for five years having provided that if the licensee should fulfil all its terms and conditions an extension should be granted for the life of the patent, and before the expiration of the five years the licensee was prevented from continuing performance and it had been agreed that he need no longer tender royalties, as they would not be accepted, but it was his purpose to rely on an extension and defendants knew of such purpose, failure to give notice of intent to renew would not prevent an extension.    p. 342.

8. Where the owner of the patent claimed that the license was terminated and that he would not have consented to any extension as provided in the contract, notice by the licensee of an intention to extend it would have been useless and was not required.    p. 343.

9. The owner of the patent having given an exclusive license for its manufacture and sale in foreign countries, a corporation which acquired all its property and rights acquired only the domestic rights in such article.    p. 344.

10. Though the trade-name used by the licensee in selling the patented article in foreign countries was an infringement in the United States of the trade-name of a third person, where the licensee was the first to enter the foreign field his rights were paramount to those of one acquiring such third person's rights.    p. 344.

11. A trade-mark right is not a right in gross, and the right to its exclusive use depends upon its actual use in any locality; and priority of use outweighs priority of invention.    p. 344.

12. One having a license to sell a patented article in foreign coun-
   tries was not concerned with any confusion arising in the
   United States, where his license was not effective, because
   of the similarity of the trade-name under which the article
   was sold with that of a third person.   p. 344.


APPEAL from a judgment of the circuit court for Mil-
waukee county: GUSTAVE G. GEHRZ, Circuit Judge.   *Re-
versed*.

The complaint in this action consists of three causes of
action, upon each of which plaintiff seeks specific relief in
equity.

In the first cause of action it is alleged that on April 4,
1916, plaintiff and the defendant, *The Erwin Company*,
hereafter called *Erwin Company*, entered into a written
contract whereby the *Erwin Company* granted to plaintiff
for a period of five years the exclusive right to manufacture
and sell in countries other than the United States a portable
fire extinguisher described in letters patent owned by the
*Erwin Company*, together with all the improvements upon
the extinguisher or the process used in connection therewith,
upon certain terms and conditions set forth in the contract;
that thereafter the *Erwin Company* made a similar contract
with the *Erwin Manufacturing Company*, except that that
company was prohibited from making extinguishers in the
United States for shipment to or sale in any foreign coun-
try; that plaintiff entered upon performance of the contract;
that at a meeting of the stockholders of the *Erwin Company*
on July 26, 1918, it was attempted to cancel plaintiff's con-
tract, and a notice of such attempted cancellation was mailed
to plaintiff on July 29, 1918.

It was further alleged that subsequent to such notice the
*Erwin Company* refused to deliver to plaintiff orders and
inquiries from jobbers pertaining to the shipment of ex-
tinguishers to countries other than the United States; made
sales and permitted others to make sales of fire extinguishers

without the United States, and fraudulently attempted a cancellation of plaintiff's contract.

Plaintiff asked judgment against all the defendants declaring the contract to be in full force and effect and that the defendants *Erwin Company* and *Foamite Firefoam Company* specifically perform the contract.

The second cause of action incorporated all the allegations of the first cause of action and in addition alleged that in fraud of plaintiff's rights the *Erwin Company,* the *Erwin Manufacturing Company,* and *O. R. Erwin* made representations to the MacAndrews & Forbes Company and others that the plaintiff's contract had been canceled and terminated; that in November and December, 1918, the *Erwin Company* entered into contracts with the MacAndrews & Forbes Company, the *Erwin Manufacturing Company,* and *O. R. Erwin* whereby it attempted to transfer to the defendant *Foamite Firefoam Company* all its right, title, and interest in and to the letters patent enumerated in plaintiff's contract free and clear from the rights and benefits of plaintiff under the contract; that the *Foamite Firefoam Company* refused to carry out the terms of the contract and breached them by representing to the trade that plaintiff had no right to manufacture or sell the fire extinguisher covered by the patents, and by making sales of the extinguishers in foreign countries in fraud of plaintiff's rights.

The relief demanded was that defendants be enjoined from interfering with plaintiff in carrying out his contract, for an accounting to determine the amount due plaintiff from the *Foamite Firefoam Company* because of sales made in fraud of plaintiff's rights, and for a money judgment for the amount ascertained to be due.

In the third cause of action the allegations of the first cause of action were repeated, and it was further alleged that *O. R. Erwin* was at all times an active officer of both the defendant *Erwin Company* and the *Erwin Manufacturing Company;* that it was the practice of plaintiff, with the

knowledge of the *Erwin Company,* to purchase a large portion of the extinguishers sold by him in foreign countries from the *Erwin Manufacturing Company;* that the *Erwin Manufacturing Company,* knowing of plaintiff's contract with the *Erwin Company,* failed and refused to refer to plaintiff orders and inquiries received by it for extinguishers to be sold and shipped to foreign countries; and that such failure and neglect by the *Erwin Manufacturing Company* was with the knowledge and consent of the *Erwin Company;* and that the *Erwin Manufacturing Company* with the knowledge and consent of the *Erwin Company* breached plaintiff's contract by accepting orders for extinguishers for shipment to countries other than the United States.

The relief asked was that an accounting be ordered to determine the amount due plaintiff from the *Erwin Company* and the *Erwin Manufacturing Company* by reason of the above sales in foreign countries, and for a money judgment against the two companies for the amount ascertained.

The contract referred to recited that the *Erwin Company* was the owner of certain patents for improvements in the process of extinguishing fires and the owner of a portable extinguisher made in various sizes and described by the name of "Erwin Fire Extinguisher" and "Firefoam;" and that patents for the invention had been issued in certain foreign countries; that in consideration of mutual covenants contained in the contracts it was agreed:

That the licensor grants to the licensee an exclusive license to manufacture and sell the portable fire extinguisher in countries other than the United States for a period of five years, and that "if the licensee shall fulfil all the terms and conditions of this agreement within said period of five years an extension of this agreement shall be granted to said licensee for the life of the patent;"

That all improvements upon the extinguisher or process during the continuance of the license shall be included within the terms of the contract;

That the licensee shall pay a royalty of twenty cents per gallon on certain extinguishers and forty cents per gallon on others, such royalty to be paid quarterly;

That "the licensee further covenants and agrees that he will as diligently as conditions will permit push the sale of said extinguishers in foreign countries;"

That in the event the licensee shall not pay the royalty on said extinguishers to the amount of $1,250 for the second year, $1,500 for the third year, $2,000 for the fourth year, and $2,500 for each year thereafter, or in the event the licensee shall default in any other condition of the contract, the licensor may terminate the agreement by thirty days' notice in writing sent to the licensee;

That the licensor shall turn over to the licensee all orders and inquiries received by it for the portable extinguishers to be sold in foreign countries;

That the licensee, within three months after the expiration of any period within which working is required to protect patents in foreign countries, will notify licensor of all proceedings taken by him toward working the invention in each of the foreign countries covered by the license, and will give to licensor an opportunity to perform such additional working as may be necessary to continue the patents in such countries.

It was also agreed that the licensee should keep an accurate account of all extinguishers sold under the agreement, and should, if called upon, render a sworn account at the end of any three months' period.

The answer of the defendant *Foamite Firefoam Company* to the first cause of action alleged that the *Erwin Company* and the *Erwin Manufacturing Company* had been dissolved prior to the commencement of the action and existed only for the purpose of suing and being sued; and that the contract between plaintiff and the *Erwin Company* had been canceled and terminated.

As to the second cause of action it was alleged that there had been a valid sale and transfer of the assets of the *Erwin Company* and the *Erwin Manufacturing Company* to the *Foamite Firefoam Company*.

As to the third cause of action the defense pleaded in the first cause of action was repeated, and, in addition, knowledge or information of the transaction between plaintiff and the *Erwin Company* and the *Erwin Manufacturing Company* was denied.

For a further defense and by way of counterclaim it was alleged that the contract of plaintiff had been canceled because of the failure of plaintiff to live up to its terms; that plaintiff had acquired no rights under the contract, since the extinguishers he sold were not those contemplated by the contract but were based on a different theory; that plaintiff had been allowed to sell these because the type contemplated was a failure; that the word "Firefoam" had been adjudged an infringement of the word "Foamite" by the United States court for the Eastern district of Wisconsin, and that since then none but the *Foamite Firefoam Company* had a right to use the term; that, notwithstanding, plaintiff had sent circular letters to prospective customers in Great Britain using as his own the name Firefoam Manufacturing Company.

The relief asked in the counterclaim was that plaintiff be restrained from offering for sale or representing that he had a right to sell any fire extinguishers in connection with the name "Firefoam," and that the *Foamite Firefoam Company* be awarded damages because of plaintiff's infringement.

The *Erwin Company*, the *Erwin Manufacturing Company*, and *O. R. Erwin* filed answers substantially the same as that pleaded by the *Foamite Firefoam Company*.

By way of reply to the counterclaim of the *Foamite Firefoam Company* plaintiff alleged that as a result of the war he was unable to work up a good foreign business, but that

he did his best; that the contract was not terminated; and that the *Foamite Firefoam Company* knew the circumstances and were subject to the terms of the contract.

The notice of cancellation of the contract was mailed on July 29, 1918, and was as follows:

"You will please take notice that the certain written agreement dated the 4th day of April, 1916, and executed by the *Erwin Company* as licensor and by you as licensee, and the license granted thereby, is hereby terminated and canceled, said termination and cancellation to become effective thirty days from this date, to wit, on August 29, 1918.

"The termination and cancellation of said agreement and license is based upon the following grounds:

"1st. Upon your failure to make reports or payments of license fees on the 1st day of July, 1918.

"2d. Upon your failure to diligently push the sale of the fire extinguishers mentioned in said license in any foreign country.

"3d. Upon your failure to pay the royalty fee due July 1, 1918, on business done during the quarter from April 1 to July 1, 1918.

"4th. Upon your failure to take any proceedings toward working the invention in any of the countries named in said agreement wherein you were granted a license; and upon your failure to notify the *Erwin Company* of anything done or left undone by you in that regard.

"5th. Upon your failure to live up to the spirit and purpose of said agreement in any particular, and your failure to do or perform any of the obligations required therein to be performed on your part."

It appears that as a result of agreements made in November and December, 1918, between the *Erwin Company,* the *Erwin Manufacturing Company, O. R. Erwin,* MacAndrews & Forbes Company, and the Foamite Fire Extinguisher Company, a new company known as the *Foamite Firefoam Company* was organized. This company took over the rights and patents of the other companies and individuals and made payment therefor in cash and stock of the new

corporation.   Some of the officers of the *Erwin Company*
and the *Erwin Manufacturing Company* were elected offi-
cers of the new company.

On behalf of the plaintiff it was shown that he and the
officers of the *Erwin Company* had together worked out
certain advertising circulars to be used in the United States
and foreign countries; that plaintiff had written letters to
various men in the United States consular service with a
view to finding agents for the extinguishers; that circular
letters had been sent to various prospects in foreign coun-
tries; and that advertising matter had been carried in the
Export American Industries.   It was also shown that plaint-
iff had paid the minimum royalty provided for in the con-
tract and that until December 17, 1918, plaintiff continued
to sell extinguishers and give checks for the royalties.

Plaintiff testified that he made an honest effort to adver-
tise the extinguishers by way of ads in trade journals and by
circulars; that he attempted to sell to purchasing agents
representing the countries engaged in war; that because of
embargoes and restrictions on shipping space he was unable
to interest foreign mercantile houses; that the chief reason
the *Erwin Company* attempted to cancel the contract was
because it wished to negotiate with the *Foamite Company*
free from the obligation.

On behalf of the defendants it was shown that during the
first year of the contract only six extinguishers were sold by
plaintiff; that the royalties during the second year amounted
to only $238.70; and that the royalties from April 1, 1918,
to July 1, 1918, were approximately $175.30.   They offered
proof that other concerns engaged in selling like commodi-
ties were not hampered by the war conditions; that plaintiff
sent no agents abroad, but depended entirely upon letters
and advertising to work up the business.

A large amount of evidence was introduced concerning an
extinguisher known as the three-chamber engine, which de-
fendants claimed was not within the terms of the contract,

The suit was commenced on March 4, 1919. On May 8, 1920, the court handed down tentative, unsigned findings of fact. These findings were very elaborate and it is only necessary to summarize them. It was found that when the contract was executed the *Erwin Company* had not had previous experience in this business; that plaintiff had had experience in marketing other articles in foreign countries; that he was of modest means and knew nothing about marketing fire extinguishers and that this was known to the *Erwin Company;* that on April 4, 1916, the design of the extinguisher of the *Erwin Company* was only in the experimental stage; that the first delivery by the *Erwin Company* to the plaintiff of salable articles was in May, 1917; that war conditions rendered communication with foreign countries very difficult and in some instances impossible except by censored mail; that even in normal conditions considerable time would be necessary to establish the foreign trade; that from the time of making the contract plaintiff kept the principal officers of the *Erwin Company* informed of his plans, the extent of his activities, the results, and the war conditions; that the *Erwin Company* did not criticize but approved the plaintiff's plans up to July 29, 1918, and that this led plaintiff to believe that they were in all respects satisfied; that up to July 29, 1918, plaintiff pushed the sales as diligently as conditions permitted; that other methods might have been more effective but were not feasible because of such conditions; that the officers of the *Erwin Company* never until after the commencement of the action expressed any desire that he adopt other methods; that on April 4, 1916, plaintiff advanced the $1,250 minimum royalty; that the only demand of the *Erwin Company* for a report was made January 16, 1918; that on April 4, 1918, a full report was made, received, and accepted without criticism; that from April 4, 1917, until April 4, 1918, the *Erwin Manufacturing Company,* without the consent of the plaintiff, made sales in foreign countries of certain extinguishers and

the *Erwin Company* accepted the royalties on such sales; that on or about July 1, 1918, plaintiff made demand for a settlement of this matter so that he could pay the net royalties due the *Erwin Company,* but was advised by the officers of the *Erwin Company* that such report and payment would not be required until after his return from a vacation; that plaintiff relied on this advice and did not make his report or pay the royalties until after his return on or about July 31, 1918; that knowing these facts and knowing of plaintiff's absence the directors of the *Erwin Company* had a special session and recommended the forfeiture of the contract; that the stockholders, knowing the facts above recited, had an annual meeting July 26, 1918, and directed service of a written notice of forfeiture; that plaintiff was a stockholder and was not given the notice required by the by-laws; that from July 26, 1918, until December 7, 1918, plaintiff continued performance under the contract without objection, and that the *Erwin Company* received plaintiff's reports and checks for sales on October 15, 1918, and for sales on December 12, 1918, and has ever since received the reports without criticism; that from June, 1918, until the fall of 1918 the *Erwin Company* and the *Erwin Manufacturing Company* carried on negotiations with Eastern parties for the settlement of differences involving the alleged infringement by the *Erwin Manufacturing Company* of patent and trade-mark rights claimed by the Foamite Fire Extinguisher Company and the MacAndrews & Forbes Company and involved in litigation between said three parties in the United States court for the Eastern district of Wisconsin; and that in said negotiations, continuing to November 9, 1918, the inclusion and disposition of the foreign rights in and to said patented process covered by plaintiff's license was discussed and considered by said parties. In finding number 20 the court found:

"That defendant, the *Erwin Company,* forfeited plaintiff's contract because such action on its part was by it

deemed necessary or advantageous in order to consummate a satisfactory and successful agreement by either settlement of litigation or consolidation by the defendants, the *Erwin Company* and *Erwin Manufacturing Company*, with the Foamite Fire Extinguisher Company and the MacAndrews & Forbes Company."

It was further found that the defendant *Foamite Firefoam Company* was incorporated pursuant to two contracts dated November 9 and December 31, 1918, between the *Erwin Company*, the *Erwin Manufacturing Company*, the Foamite Fire Extinguisher Company, and the MacAndrews & Forbes Company, wherein the *Erwin Company* and the *Erwin Manufacturing Company* agreed to sell and assign to the *Foamite Firefoam Company* all their rights, including those claimed by plaintiff in the contract in suit, and that on January 3, 1919, the *Erwin Company* executed a bill of sale and assignment to the *Foamite Firefoam Company* of all said assets and rights without warranty as to the validity and existence of plaintiff's contract; that on or before this time the Foamite Fire Extinguisher Company, the Mac-Andrews & Forbes Company, and the *Foamite Firefoam Company* knew of the existence of plaintiff's contract and its terms and of plaintiff's claims; that on January 4, 1919, without the knowledge or consent of plaintiff, the United States court for the Eastern district of Wisconsin entered a decree in the case of the Foamite Fire Extinguisher Company and MacAndrews & Forbes Company against the *Erwin Manufacturing Company* (to which suit the plaintiff or his licensor, the *Erwin Company*, were never parties) pursuant to the terms of said contracts and the stipulation of said parties, in which decree it was declared that the *Erwin Manufacturing Company* was guilty of infringement of the patent owned by the Foamite Fire Extinguisher Company and the MacAndrews & Forbes Company, and that the trade-name "Firefoam" used by the *Erwin Manufacturing Company* was an infringement of the trade-name "Foamite."

The court made findings as to certain types of extinguishers not necessary to be stated.

It was further found that about September 1, 1914, predecessors in title of the *Foamite Firefoam Company* originated and adopted as a trade-mark the term "Foamite" and began its use publicly in the United States and in foreign countries; that this trade-mark became the property of the defendant *Foamite Firefoam Company* shortly after its incorporation and that before the commencement of this action it was used and owned by that company; that the word "Firefoam" was invented by the *Erwin Company* and the *Erwin Manufacturing Company* about the year 1916, and was used as a trade-mark extensively by them, and considerable money was spent by said companies in advertising; that pursuant to the contracts made in November and December, above mentioned, the Foamite Fire Extinguisher Company, on January 6, 1919, transferred to the *Foamite Firefoam Company* all its rights to said trade-name "Foamite," and that on January 3, 1919, the *Erwin Company* and the *Erwin Manufacturing Company* assigned to the *Foamite Firefoam Company* all their rights to the trade-mark "Firefoam," but that the plaintiff had never made any such assignment.

As conclusions of law the court found that the contract of April 4, 1916, was in full force and effect; that plaintiff was entitled to specific performance thereof by defendant *Foamite Firefoam Company* as successor and assignee of the *Erwin Company* and *Erwin Manufacturing Company;* that plaintiff was entitled to an accounting from the *Erwin Company,* the *Erwin Manufacturing Company,* and the *Foamite Firefoam Company* for damages on sales of all types of portable extinguishers in foreign countries, except a certain three-chamber engine type, from April 4, 1916, and a judgment for the amount of his damages; that defendants should be enjoined from interfering in the performance by plaintiff of the terms of the contract of April 4, 1916; and

that possessions and dependencies of the United States are not foreign countries within the meaning of the contract.

The court asked further arguments on the question whether there was an infringement, and whether the royalties due from plaintiff to defendants under the contract for the third and fourth years should not be set off against any amount which might be found to be due plaintiff from defendants on sales made by the latter in violation of plaintiff's rights under his contract.

On July 25, 1920, defendants sent a second notice declaring the contract terminated.

On June 30, 1921, the court granted defendants leave to amend their answers. Pursuant to this order the defendant *Foamite Firefoam Company* filed an amended answer, the material allegation of which was that notwithstanding since November, 1918, conditions had existed under which it was within the power of plaintiff to fulfil his contract of April, 1916, he had utterly failed to do so and had considered the contract as abandoned, and should be entitled to no rights under it.

On July 6, 1922, the court filed final findings of fact. In addition to those contained in the tentative findings it was found, in substance, that plaintiff had in no wise carried out or performed the contract in suit since December 17, 1918; that confusion had arisen because of the use by plaintiff of the trade-name "Firefoam" and the use by defendant of the trade-name "Foamite;" and that plaintiff was entitled to an accounting from the defendants *Erwin Company* and *Erwin Manufacturing Company* for damages due him on sales made by defendants of extinguishers in countries other than the United States from April 4, 1916, until December 17, 1918, less the royalties due defendant *Erwin Company* under the contract.

The judgment provided that the contract was terminated by the notice of July 25, 1920; that plaintiff had no right to use the trade-name "Firefoam" in any way relating to

fire extinguishers; that plaintiff be enjoined from so using the name; that the defendants recover nothing for alleged trade-mark infringement; and that a referee be appointed to compute the damages due plaintiff.

Plaintiff appealed from the judgment and defendants filed a cross-appeal.

For the appellant there was a brief by *David S. Rose,* attorney, and separate briefs by *George A. Gessner,* of counsel, and *Paul D. Durant,* attorney, all of Milwaukee; and the cause was argued orally by *Mr. Rose* and *Mr. Gessner.*

On behalf of the respondents *Erwin Company* and *Erwin Manufacturing Company* there were briefs by *Lawrence A. Olwell* of Milwaukee, attorney; for the respondent *Foamite Firefoam Company* a brief by *Mr. Olwell,* attorney, with *A. H. Burroughs, H. L. Brown,* and *Charles Hallett White,* all of New York City, of counsel, and a reply brief by *Mr. Olwell,* attorney, and *Mr. White,* of counsel; and the cause was argued orally by *Mr. White* and *Mr. Olwell.*

The following opinion was filed May 1, 1923:

JONES, J.   We are satisfied that the finding of the trial court that the plaintiff used such diligence as was required by the contract up to the time of the notice of July 29, 1918, was abundantly supported by the evidence.   We shall not detail at any length the testimony upon which this finding was based.   The testimony shows that soon after the execution of the contract the plaintiff began an extensive system of advertising in Europe, the Orient, and South American countries.   He sent letters and circulars to between four and five hundred American consuls soliciting information and assistance.   He also corresponded with commercial attachés, and it appears from the voluminous record that these correspondents freely responded, giving the names of firms which might become customers.   Other lists were obtained from export houses and chambers of commerce in various foreign cities.   This information was followed up by letters

and circulars sent to those who might be prospective cus-
tomers. The plaintiff's work was interfered with until May,
1917, because the *Erwin Company* and the *Erwin Manufac-
turing Company* could not furnish salable extinguishers.

Arrangements for manufacture abroad were not con-
summated owing to the peculiar conditions due to the war,
such as the lack of labor and inability to get raw material
for the manufacture of steel. In some instances foreign
governments would not permit labor or raw material to be
used outside of war work unless it was necessary. The
French government would not permit the importation of
fire extinguishers during the war. In some instances, owing
to war conditions, orders from foreign countries could not
be filled for nearly two years.

During all this period no complaint or criticism was made
by the *Erwin Company*. It was kept fully apprised of the
situation and knew the difficulties under which the plaintiff
was operating. The undisputed testimony shows that the
president of the *Erwin Company* suggested and consented
that certain payments and a report which the plaintiff was
willing to make be deferred until after his vacation, and that
during his vacation and absence in July, 1918, without giv-
ing the notice to which he was entitled as a stockholder, a
meeting was held and the notice relied on as a termination
was directed to be given. Under these circumstances the
recitals in the notice of termination were so grossly untrue
that the inference is irresistible that the *Erwin Company*
had different reasons from those assigned for seeking to
terminate the contract.

One of these reasons appears in the fact found by the
court that prior to this time the *Erwin Company* and the
*Erwin Manufacturing Company* had been negotiating with
Eastern parties concerning alleged infringements, which ne-
gotiations led up to the contracts made in November and
December, 1918, and which culminated in the settlement of

the suit by a stipulated decree and the consolidation of all. their interests.

In our opinion the finding of the trial court on this branch of the case was fully warranted, and the court would have been justified in finding that the notice was given in bad faith and in utter disregard of the plaintiff's rights. The subsequent conduct of the *Erwin Company* in receiving reports and checks for sales while plaintiff was continuing in performance of the contract without objection up to December 17th indicated that the company had little faith in the efficacy of the notice it had served.

We now come to the question whether the trial court erred in refusing to adopt its tentative findings decreeing specific performance. On December 17, 1918, the *Erwin Company* returned to the plaintiff certain checks already mentioned, and in the letter returning them the plaintiff was notified that the *Erwin Company* had been advised by its counsel that the contract of 1916 had been terminated. It seems that after this notice the plaintiff proceeded no further in carrying on the work in foreign countries. Between July 29th and this date he had carried on the work without objection. In the interval there had been conferences between the plaintiff and officers of the *Erwin Company* in which he had made objection to the notice in which they had declared the contract terminated and canceled.

During this period the negotiations had been going on between the *Erwin Company* and the Eastern parties which terminated in the agreements by which all their interests were combined. In January, 1919, after the organization of the *Foamite Firefoam Company*, that company sent its representatives abroad to introduce and sell in foreign countries the extinguishers which had theretofore been sold by plaintiff. On February 25, 1919, the *Foamite Firefoam Company* notified the plaintiff that he should not continue to infringe its patent rights or trade-marks, as he had no right

to manufacture or sell any fire apparatus of the foam type. On the same day it sent a letter to the plaintiff requesting him to notify a prospective client that he, the plaintiff, had no further rights in connection with the business, and that he would forward a certain order for it to fill; that if this were done it would obviate the necessity of explaining the true situation.    On February 24, 1919, the *Foamite Firefoam Company* wrote to the firm which had been manufacturing the extinguishers as follows: "that as the articles in question are protected by patents, our designs, drawings, patterns, and dies are not to be used for any work except that ordered by ourselves, nor are the manufactured articles to be sold to any one other than ourselves or upon our order."

This letter indicated that the manufacturing concern had already been manufacturing for the *Foamite Firefoam Company*. The manufacturing company acceded to this demand.

This action was commenced March 4, 1919.    In the counterclaim of the *Foamite Firefoam Company* that company prayed that the plaintiff be perpetually enjoined from selling, or offering or soliciting the sale of, any of the fire-extinguishing apparatus in which he had been dealing and from representing that he was offering for sale any of the same.

When the letters mentioned above were written, the *Foamite Firefoam Company* had absorbed the business and assets of the *Erwin Manufacturing Company* and the *Erwin Company* and was planning its campaign for extensive sales in foreign territory in which plaintiff had been operating.    Before December 17, 1918, when plaintiff was notified that no more royalties would be received by the *Erwin Company,* he had sold extinguishers in foreign countries to the amount of about $18,500, and the sales sheets show that the greater part of such sales had been made during the latter part of the period during which he had been at work.    The earlier part of the period had been used in giving publicity to the sales, and after such publicity had been given, and the war

Gessler v. Erwin Co. 182 Wis. 315.

and the obstacles occasioned thereby had ceased, his work had progressed very favorably.

It is claimed by the defendants that notwithstanding the sale to the *Foamite Firefoam Company,* its interference with the plans of the plaintiff, and its entering into active competition in the territory which had been assigned to him, it was the duty of the plaintiff to continue his operations during the pendency of the suit, although he had been notified that no more royalties would be received and that the *Erwin Company* and its successor regarded the contract as terminated and canceled, and this was the view accepted by the trial court in the final findings of fact and conclusions of law. It is claimed by the defendants that this was necessary in order to preserve rights under the patent laws of foreign countries, and necessary to preserve his own rights, if any he had, to specific performance of the contract.

On the other hand, it is claimed by the plaintiff that the conduct of the *Erwin Company* and its successor in interfering with and preventing sales by its action in treating the contract as terminated and canceled rendered it unnecessary and practically impossible for the plaintiff to carry on his operations in the manner provided by the contract.

It is contended by counsel for the defendants that the notice of July 29, 1918, and the refusal to receive royalties and recognize the rights of the plaintiff did not constitute a renunciation of the contract; that there was nothing for the *Erwin Company* and its successor to perform except to receive royalties and observe certain other independent stipulations, the breach of which could be compensated in damages; and that all the covenants on the part of the licensor were independent covenants not going to the whole consideration of the contract.

In the contract of 1916 the *Erwin Company* agreed that the extinguisher and its processes did not infringe upon any other letters patent of the United States; that it would at its own expense assume the defense of all suits for infringe-

ment, and prosecute at its own cost any infringement of the patents issued by foreign countries and defend any suits which might be brought. The company further agreed that all improvements upon the extinguisher or the processes used in its connection during the continuation of the license should be included within the terms of the contract, and that it would at all times supply plaintiff with copies of all testimonial letters or instruments it might receive for his use in advertising and selling, and that it would promptly deliver to the plaintiff, without compensation except the royalty, all inquiries or orders from jobbers, commission houses, and from all sources which related to extinguishers to be shipped out of the United States, and that it would pay all taxes against the patents in countries covered by the license, and that it would furnish the plaintiff with all credentials and other evidence of the rights conferred upon him in order to enable him to ·be authorized as such licensee in other countries.

It will be seen that in entering into this contract both parties had in mind the ambitious plan to build up a large business in many foreign countries. This may be gathered from the contract itself, and especially from the conduct of the plaintiff and the *Erwin Company* during the period intervening between the date of the contract and the notice of cancellation. The parties had actively co-operated with each other and in the most friendly manner had rendered mutual assistance. It is also clear that a long campaign was contemplated, lasting at least five years, with the privilege of renewal by the plaintiff.

It is the claim of the defendant that the covenants made by the parties to the contract were entirely independent of each other, and in the briefs there is much discussion of the question whether the respective covenants were independent or whether they were mutual and reciprocal. It is intimated by counsel for defendants that after the execution of the contract the licensor had practically nothing to do except

receive the royalties and commissions, and that the covenants were so entirely independent that even if there was a breach by defendant the plaintiff was bound to continue performance. There is much discussion of this question in the briefs of the respective counsel and many cases are cited on the subject. Many of the cases relate to sales of property or real estate. None of them relates to facts at all similar to those here involved. An adequate discussion of these cases would involve long recitals of the facts in the cases cited, and seems hardly necessary. The following statements in a standard work on contracts express the general rule on the subject:

"While the courts now assume that covenants are dependent rather than independent, and concurrent on the one hand rather than precedent and subsequent on the other, this rule, like the other rules of modern law on this subject, is merely a guide to aid the court in ascertaining the intention of the parties; and it is not a rigid rule of substantive law. Whether covenants are dependent or independent, and whether they are concurrent on the one hand or precedent and subsequent on the other, depends entirely upon the intention of the parties shown by the entire contract as construed in the light of the circumstances of the case, the nature of the contract, the relation of the parties thereto, and other evidence which is admissible to aid the court in determining the intention of the parties. While a number of tests have been laid down, and while they are of great help in ascertaining the intention of the parties, they are not, at modern law, arbitrary rules, but merely guides to aid the court in discovering the intention of the parties; and accordingly they are not conclusive in every case. The fact that a covenant is referred to as a condition precedent, or as a precedent covenant, is not of itself conclusive as to its character. It is the order in which the parties intend the covenants to be performed, and not the name that the parties give to them, which determines whether they are precedent covenants or not. The intention of the parties must be ascertained from the contract as a whole, and specific provisions must be ignored if they are inconsistent with the general intent. While the fact that a

covenant goes to a part only of the consideration, or that the covenants are to be performed at different times without any apparent relation between the performance of the one and the performance of the other, may tend to show that such covenants are independent, neither of these rules can be regarded as arbitrary and unbending; and if the contract as a whole shows that the covenants are dependent, effect will be given to such intention, although one of the covenants goes to a part of the consideration only, and although the contract provides that different covenants are to be performed at different times without any apparent relation between the performance of the two. On the other hand, the injustice of the result that may follow in some cases from treating a covenant as dependent, may induce the court to construe it as independent, although in outward form it may seem to be dependent.

"While there is occasionally a lack of harmony in construing some provisions, as is often the case when questions of construction are presented, the courts agree that arbitrary tests must be discarded. Special emphasis is placed upon good sense or common sense as the best guide in ascertaining the relation of the covenants. The order in which the covenants appear in the contract is generally regarded as immaterial; while there is apparently some authority to the contrary. The fact that the contract provides that one party shall 'first' do a certain act does not of itself show conclusively that such covenant is intended as a precedent covenant. A covenant may be precedent as to one or more covenants to be performed by the adversary party, and concurrent or subsequent as to others. Under a building contract requiring payment by instalments at certain specified dates and requiring the building to be completed at an intervening date, the completion of the building was a condition precedent to the payment of the instalments due after the date fixed for completion." 5 Page, Contracts (2d ed.) § 2948.

We are convinced that the covenants were not so far independent of each other that under all the circumstances the defendants could breach the contract in the manner they did and still insist that the plaintiff should continue performance during the pendency of the suit.

There is one important feature of this case which distinguishes it from those referred to by counsel for defendants. The express covenants in the contract have already been stated. There was also an implied agreement by both parties that neither would do any act preventing or tending to prevent its performance. The rule was well stated by Mr. Justice DODGE in the opinion in *Manning v. Galland-Henning P. M. D. Mfg. Co.* 141 Wis. 199, 203, 124 N. W. 291:

"But the grant from defendant to plaintiff's assignor was also a contract. It granted an exclusive right to make, use, and vend. In all contracts granting property rights, or rights of conduct, there is an implied agreement on the part of the assignor that he will do no affirmative act to derogate from his grant. That is implied in the very grant itself. In the nature of things it is inconceivable that the minds of the parties have met on basis of a grant of something and, at the same time, on negation of that grant, in whole or in part. This principle is very old in the law and has been applied to a great variety of circumstances; in many cases being carried to the point of declaring to be implied covenants going much further. The grantor or lessor of land, in absence of statute, covenants for the quiet enjoyment of the property demised, and, even where statutes have negatived such implication, he is still held to have covenanted not to derogate from such grant by his own acts. A contract for exclusive agency implies that the principal will commit no act invasive of the exclusiveness of such agency. The grantor of an exclusive license under a patent is in the same position and subject to the same rule, as has often been decided."

In that opinion many Wisconsin and other cases are cited as authority for this familiar rule and it is unnecessary to cite them again. This rule is not confined to actual and successful prevention of performance by one of the parties.

"It is as effective an excuse of performance of a condition that the promisor has hindered performance as that he has actually prevented it. The early decisions are to the contrary, but it seems evident that the same principle of justice which precludes a promisor from taking advantage of a

condition the performance of which he himself has pre-
vented, precludes him also from setting up a condition the
performance of which he has made more difficult.  'Where
a party stipulates that another shall do a certain thing, he
thereby impliedly promises that he will himself do nothing
which will hinder or obstruct that other in doing that thing;'
and indeed if the situation is such that the co-operation of
one party is an essential prerequisite to performance by an-
other, there is not only a condition implied in fact qualifying
the promise of the latter, but also an implied promise by the
former to give the necessary co-operation."   2 Williston,
Contracts, pp. 1307, 1308.

Instead of continuing to co-operate with the plaintiff as
it had agreed, the *Erwin Company*, without the knowledge
of the plaintiff, entered into an arrangement with the East-
ern parties which from its very nature would tend to sup-
plant him unless his rights were given consideration.   With-
out cause it notified him that his contract was canceled and
has ever since based its claim on that notice as well as on the
other notice of June 24, 1920.   Instead of defending actions
to protect plaintiff from infringement, the *Erwin Company*
and the *Erwin Manufacturing Company* assumed to sell to
the *Foamite Firefoam Company* all their rights, domestic
and foreign, to the trade-name "Firefoam," thus facilitating
and encouraging the bringing of actions against the plaintiff.
The letters of the *Foamite Firefoam Company* after it as-
sumed control contained the implied threat that he would be
prosecuted if he continued the sale.

Although the contract did not limit the plaintiff in ob-
taining his extinguishers to any particular manufacturing
company, the notice to the firm with which the business had
been carried on, and complied with by that company, to
furnish no more extinguishers to the plaintiff, was another
fact tending to show that so far as possible prosecution of his
work would be thwarted at every stage.   The prayer for
injunction preventing plaintiff from continuing the sales
was another illustration of the deliberate purpose to prevent
him from carrying out the contract.   The plaintiff found

that instead of having the co-operation and assistance of the *Erwin Company* and its successor he was to have their determined resistance.

The *Foamite Firefoam Company* had taken an assignment of the trade-marks of the *Erwin Company* with full notice, not implied but express, of the rights and claims of the plaintiff, and yet it proceeded to enter his territory and carry on a large business with which plaintiff could have little hope of competing. By several years of labor and considerable expenditure of money he had given in foreign countries publicity to his undertaking and at the time of the so-called cancellation was in a situation to reap the profits of his industry. The *Foamite Firefoam Company* entered the same field, and at the time of the trial had made sales of portable extinguishers amounting, according to its exhibits, to over $247,000.

It is argued in behalf of the *Foamite Firefoam Company* that it entered the foreign field to preserve rights to the trade-names, but their persistent efforts to prevent the plaintiff from carrying on his work and the apparent financial success of their operations indicate to us that they were influenced by far different motives. It is also argued that notwithstanding the obstacles in his way the plaintiff should have brought suits to enjoin defendants if he believed they were interfering with his rights, instead of ceasing his endeavors on the work. He asked for such an injunction in the present suit. There is no claim that he had not prosecuted the action with as much diligence as possible. The suit was in progress before judgment for over three years. The record consists of over 2,500 typewritten pages and the exhibits are correspondingly voluminous. If he had instituted other actions he could not have relied on the findings of the court in this action, since they were unsigned and expressly made only tentative findings.

On the assumption that plaintiff abandoned the contract and his operations without cause, the argument of defendants' counsel that such abandonment would preclude a re-

covery is entirely logical, but we cannot agree with the premise thus assumed. Abandonment is purely a question of intent. As said by Mr. Justice BROWN:

"To establish the defense of abandonment it is necessary to show not only acts indicating a practical abandonment, but an actual intent to abandon. Acts which unexplained would be sufficient to establish an abandonment may be answered by showing that there never was an intention to give up and relinquish the right claimed." *Saxlehner v. Eisner & Mendelson Co.* 179 U. S. 19, 31, 21 Sup. Ct. 7, 45 Lawy. Ed. 60.

In view of the facts which have been stated, we conclude that he could not continue successfully, during the pendency of the suit, to carry on his work and maintain business relations with those who refused to accept royalties or co-operate with him in any manner and who were actively resisting his efforts. When he found that it was practically impossible to carry out the contract he made tender of performance and kept the tender good until the judgment was rendered. In the complaint in this action he declared that he was ready, willing, able, and anxious to carry out and perform the terms of the contract. At the final hearing the offer was renewed and consent was given that the court might make any decree there granted conditional upon performance.

From what has preceded it follows that we cannot sustain certain findings of fact made by the trial court. Among those findings are the following: that it was necessary for the *Foamite Firefoam Company,* by reason of plaintiff's failure to perform the contract after December 17, 1918, to enter the foreign field to protect and preserve the subject of the contract from loss and ruin; that the *Erwin Company* did not intend to renounce or repudiate the contract by the first notice given and that it believed it had the right to declare a forfeiture of the contract; that plaintiff had in no wise carried out or performed the contract since December

17, 1918; that no act of the defendants had prevented such performance; that plaintiff could, in the exercise of reasonable diligence, have carried out and performed said contract, to at least the same, and probably to considerably greater, extent than he did prior to that date; that on June 25, 1920, the *Erwin Company,* pursuant to the provisions of the contract and for good and just cause, duly gave written notice of forfeiture to the plaintiff effective July 25, 1920.

The trial judge evidently gave the case very careful consideration, and if the findings had been based for the most part on disputed questions of fact we might feel that they should not be disturbed. But the facts are almost wholly proven by documentary evidence and are practically without conflict. We are, however, unable to agree with the trial court as to the rules of law to be applied.

It is claimed by counsel for defendants that the contract of April 4, 1916, expired by its own limitation at the end of five years because the plaintiff failed to diligently perform and failed to exercise his option for renewal. The question of abandonment and diligence on the part of the plaintiff has already been discussed. The contract granted the exclusive right for five years and contained the following clause:

"The licensor hereby grants to the licensee an exclusive license to manufacture, use, and sell the said portable fire extinguisher within and throughout all countries, other than the United States of America, for the term of five years from the date hereof, such licensee to have the right to grant sub-licenses for said purposes in said foreign countries; if the licensee shall fulfil all the terms and conditions of this agreement within said period of five years, an extension of this agreement shall be granted to said licensee for the life of the patent or patents described above upon the same terms and conditions of this agreement."

It is argued by defendants' counsel that this should be construed as a present grant for five years and an agree-

ment, upon certain conditions, *to make* a further grant; that plaintiff was under no obligation to renew the contract, and that after the expiration of the agreement it would have been incumbent on him to do some affirmative act indicating his intent to renew.   Counsel cite *Adams & Westlake Mfg. Co. v. Westlake,* 53 Fed. 588.   In that case defendant agreed to renew, *if requested.*   Plaintiff requested a renewal, but he requested a six-year renewal instead of the five he was entitled to, and the attorney who wrote the request signed it as attorney for the plaintiff and also for a company with which defendant had no contract.   It was held that the request was not for a renewal in accordance with the terms of the contract and that the contract had expired.

It will be observed that in the instant case it is not provided, that on performance of the conditions the licensor will then make a new agreement or grant, but it is provided that "an extension of this agreement shall be granted."   No notice or request was stipulated in the contract.   If the plaintiff had not been hindered and prevented from performing the contract there can be no doubt that by continuing to perform after the five years the contract would *ipso facto* have been extended.   From a colloquy between counsel at the final hearing it appears that on June 24, 1920, when the second notice purporting to abrogate the contract was served, it was agreed that it was unnecessary for plaintiff to continue to tender royalties, as they would not be accepted.   It seems to have been agreed that the legal situation should be just the same as if the parties had argued the case the next day after this second notice of termination and the court had made its findings; that clients should not suffer or their rights be affected by reason of delay in presenting the matter to the court.   It is evident to us from the entire history of the litigation that it was the purpose of the plaintiff to rely on his right to extension of the contract during the life of the patents and that this purpose was well known to defendants.

Gessler v. Erwin Co. 182 Wis. 315.    ,

It is also plain that the conduct of the defendants, from the time the litigation commenced and before, demonstrated that defendants would not have consented to any extension, on their theory that the contract was terminated. Any notice of intention to extend the contract would have been a mere useless ceremony, and no such notice was required. *Fergen v. Lyons*, 162 Wis. 131, 137, 155 N. W. 935.

In the judgment following the findings of fact and conclusions of law it was adjudged that the contract of April 4, 1916, was terminated as of July 25, 1920; that the rights of the plaintiff therein, except the right to an accounting, ceased to exist as of July 25, 1920, and that the plaintiff has no right to the use of the word "Firefoam" as a trade-mark or in any connection with his trade-name as relating to fire extinguishers; and that he be perpetually enjoined from exercising any of the rights granted by the contract and from using the word "Firefoam" as a trade-mark or in connection with his trade-name as relating to fire-extinguishing devices.

This judgment was based on the ground that plaintiff had abandoned the undertaking since December 17, 1918. We have found that there was no such abandonment by the plaintiff of his rights and that he was excused after that period from carrying on operation under the contract by the conduct of the defendants. We therefore conclude that the judgment to the effect that the contract was so terminated and that the plaintiff be enjoined from continuing sales cannot stand.

Although the court made no specific finding on the question whether plaintiff by his operations in foreign countries infringed on the trade-name rights of the *Foamite Firefoam Company,* the issue was raised and argued by the respective counsel and decided adversely to the plaintiff.

The *Foamite Firefoam Company* acquired all the property and rights of the *Erwin Company.* This included, according to their contracts, the foreign rights for the sale

of "Firefoam," but these rights were covered by *Gessler's* contract and were subject thereto. Thus the *Foamite Firefoam Company* acquired from the *Erwin Company* no rights which had been contracted to *Gessler,* and by virtue of that contract the *Erwin Company* could sell nothing but the domestic rights in "Firefoam."

*Gessler* entered the foreign field in 1917 in good faith, and had expended money and labor and established a promising trade. The *Foamite Firefoam Company* and its predecessors made no concerted effort to get foreign trade until January, 1919. Hence the rights of *Gessler* were paramount to those of the *Foamite Firefoam Company.* His rights were not affected, even though, in the United States, "Firefoam" was an infringement of "Foamite." A trade-mark right is not a right in gross. The right to its exclusive use depends upon its actual use in any locality, and priority of use outweighs priority of invention.

"The adoption of a trade-mark does not, at least in the absence of some valid legislation enacted for the purpose, project the right of protection in advance of the extension of the trade, or operate as a claim of territorial rights over areas into which it thereafter may be deemed desirable to extend the trade." *United Drug Co. v. Theodore Rectanus Co.* 248 U. S. 90, 98, 39 Sup. Ct. 48; *Hanover S. M. Co. v. Allen & Wheeler Co.* 208 Fed. 513; *Thomas G. Carroll & Son Co. v. McIlvaine & Baldwin, Inc.* 171 Fed. 125; *Columbia M. Co. v. Alcorn,* 150 U. S. 460, 463, 14 Sup. Ct. 151; Nims, Unfair Competition (2d ed.) p. 412.

Since *Gessler's* rights were paramount in foreign countries, the sales by the *Foamite Firefoam Company* were infringements.

The court found that some confusion had arisen because of the use by plaintiff of the trade-name "Firefoam" and the use by defendant *Foamite Firefoam Company* of the trade-name "Foamite." Plaintiff was not concerned with any confusion which arose within the United States, since his license was not effective there. Defendants showed no

instance where there had been confusion of names in for-
eign countries subsequent to the consolidation, and, if they
had, it would have only tended to prove that plaintiff's
and not defendants' rights were threatened.

Considerable testimony was given bearing on the question
whether a certain "three-chamber engine type" of extin-
guisher was included in the contract of April 4, 1916. The
court found on this subject: "That the so-called 'three-
chamber engine type' of extinguisher shown in the evidence
is not covered by plaintiff's license contract in suit, for the
following reasons: (a) it is not a 'portable' extinguisher
within the meaning of that term as it was used and under-
stood by the parties to the license agreement at the time it
was entered into; (b) the patents upon said 'three-chamber
engine type' of extinguisher were never owned by defendant
the *Erwin Company,* nor did the latter ever have any shop
rights therein; (c) the said 'three-chamber engine type' of
extinguisher is not an 'improvement' upon the types of ex-
tinguishers covered by the license agreement," and that
plaintiff was not entitled to any damages by reason of such
manufacture and sale. On this question there was much
conflict in the testimony, and we see no reason for disturbing
the finding of the court. The same is true with respect to
findings 25, 26, 27, and 28, which relate to certain specified
sales.

Our conclusions are that the contract between the *Erwin
Company* and plaintiff was not terminated by the notices
relied on by the defendants; that it did not expire by its
own limitation; that the contract is still in full force and
effect; that the defendants the *Erwin Company* and *Foamite
Firefoam Company* should be adjudged to specifically per-
form the same; that they should be enjoined from inter-
fering or preventing performance by the plaintiff. We ap-
prove the following portion of the fourth conclusion of law:

"That the plaintiff is entitled to an accounting from the
defendants the *Erwin Company, Erwin Manufacturing
Company,* and *Foamite Firefoam Company,* and to judg-

ment for damages due him on sales on all types of portable fire-extinguishing apparatus and machines other than the so-termed 'three-chamber engine type' in countries other than the United States, as herein defined, from April 4, 1916, to December 17, 1918, less the royalties stipulated in said contract to be computed for said period upon such sales and to be not less than the minimum royalties provided by said contract."

To this conclusion the court added that it would be inequitable to award to plaintiff profits upon sales made by defendant *Foamite Firefoam Company* after December 17, 1918. We hold that plaintiff is entitled to an accounting with the *Foamite Firefoam Company* for sales made by it in foreign countries after December 17, 1918.

*By the Court.*—Judgment reversed, and cause remanded for further proceedings in accordance with this opinion.

ROSENBERRY, J., dissents.

A motion for a rehearing was denied, with $25 costs, on January 15, 1924.