**R. L. Benson et al., Trading as Carter-Crane Controls, Appellants, v. Herbert W. Crane, Appellee.**

**Gen. No. 33,882.**

Opinion filed April 22, 1930.

KNAPP & CAMPBELL, for appellants; JOHN R. COCH-RAN and LEONARD F. MARTIN, of counsel.

MURRAY & MURRAY, for appellee; FREDERICK L. FAKE, CHARLES F. MURRAY and DONALD R. MURRAY, of counsel.

MR. JUSTICE GRIDLEY delivered the opinion of the court.

This is an appeal by complainants, trustees under a common-law trust known as Carter-Crane Controls (hereinafter referred to as Carter-Crane), from a decree of the superior court of Cook county, entered June 27, 1929, dismissing their original bill, amended bill, amended and supplemental bill, and supplemental bill for want of equity. All bills prayed for injunctional relief against defendant (hereinafter referred to as Crane.) The original and amended bills were filed when there was pending in the same court, and undisposed of, an equity suit by Crane against the trustees, whereby he sought the cancellation of certain existing license contracts between the parties and other relief. The amended and supplemental, and the supplemental, bills were filed *after* the same chancellor had dismissed Crane's suit against the trustees for want of equity.

There are four written agreements involved in the litigation. The first was signed by the parties on April 25, 1919. It recites that Crane has invented certain new and useful improvements in "Operating Means for Doors," and devices relating thereto, for which he has received four Letters-Patent of the United States (dates and numbers stated) and has filed two applications for other patents (application numbers stated) and that Carter-Crane is desirous of acquiring the exclusive right, within and outside of the United States, to manufacture and sell, rent or otherwise dispose of, control devices for doors, windows, etc., containing the improvements, and "also such other improvements or inventions in control devices as Crane may hereafter invent." It is agreed in substance:

Crane grants to Carter-Crane such "exclusive" right or license. Carter-Crane "may issue sublicenses to others," *provided* they shall themselves be engaged in the manufacture or sale of the devices (modified in a supplemental agreement of April 17, 1922). This exclusive right or license is to include any patents which may be secured in foreign countries for and with the consent of Carter-Crane,—they to pay the expense of obtaining such foreign patents. Crane is to receive $10,000 of the par value of the preferred shares of Carter-Crane, and 10 per cent (10%) of their common shares. In addition, Crane is to receive five ($5) dollars, as a license fee or royalty, upon every door control device manufactured by Carter-Crane, or by any of their sublicensees, "but in no case shall Crane receive license fees or royalties aggregating less than the following minimum amounts, viz., for the year 1919, $500; for 1920, $2,000; for 1921, $3,500; for each subsequent year not less than $5,000." (This provision also was modified in the supplemental agreement of April 17, 1922.) Upon failure of Carter-Crane

to make returns or payment of license fees, "or should they be in material default in any other manner and so continue for 90 days after written notice thereof has been *delivered* to them," Crane may terminate this license by serving written notice thereof upon Carter-Crane "at any time after said 90 days' notification in case such default be not cured within said 90 days." In case of termination Crane shall receive from Carter-Crane "one complete set of each active drawing, specification or pattern," as may be in use by them at the time, "together with all jigs and dies" employed by Carter-Crane in the manufacture of the devices. Crane grants to Carter-Crane the right to use his name for the purpose of bringing suits for infringement of the patents contemplated herein, and he agrees that he will furnish all proper assistance in prosecuting such suits, all at the expense of Carter-Crane; but Crane shall have the right at his own expense to be represented in such suits by counsel of his own selection. Any amounts collected by way of profits, damages and costs in any suit shall be retained by Carter-Crane, *provided* Crane may notify Carter-Crane of a particular infringement and request them to bring suit, and, if Carter-Crane shall not bring such suit within 30 days after such notice, then Crane shall have the right to bring such suit in his own name and at his own cost, "in which event any profits, damages and costs collected as the result of such suit shall be retained by him."

In the "supplemental" agreement of April 17, 1922, it is agreed in substance as follows:

Carter-Crane may issue an "exclusive" license to the Streeter-Amet Weighing & Recording Co., an Illinois corporation having its principal office and factory in Chicago (hereinafter in this opinion referred to as Streeter-Amet), "for the United States and its possessions and the Dominion of Canada and not elsewhere," to manufacture and sell, rent or otherwise dispose of

the devices, subject to the payment of royalties and the conditions as stated in this contract. This modification is to be binding upon Crane only so long as the contract, *signed concurrently herewith,* shall be retained by Streeter-Amet, and, in the event of cancellation or forfeiture of said Streeter-Amet contract, this contract shall automatically be terminated. And Crane agrees, in the event of violation of any of the terms of the contract of April 25, 1919, that, in addition to notifying Carter-Crane thereof, he will notify Streeter-Amet, and the latter shall have the right to discharge any obligation of Carter-Crane within 30 days after the expiration of the time allowed Carter-Crane.

In lieu of the provision providing for minimum royalties (which is canceled), Crane is to receive from Carter-Crane "three (3%) per centum of the gross list selling price to the ultimate consumer, as a license fee, upon every door control device manufactured and sold." And Carter-Crane "shall use due diligence in developing the market both at home and abroad," and "shall manufacture in quantities sufficient to meet the trade demand as developed"; and, as it is impossible now to estimate what the trade may demand, the question of any *specific minimum* of royalties is "to remain in abeyance until January 1, 1924"; and then the question of a "fair minimum for the future" is to be determined from the experience gained during the years 1922 and 1923; and in case the parties cannot then agree as to what would be a fair minimum the dispute shall be determined by arbitration in the usual manner. Crane, in consideration of the increase of royalties, agrees to return to Carter-Crane the stock in Carter-Crane Controls heretofore held by him.

In the contract of the same date, between Carter-Crane and Streeter-Amet, it is recited that the contract of April 25, 1919, *as modified,* is in full force and effect, and that by its terms Carter-Crane is empowered to

grant to Streeter-Amet an exclusive license. And it is agreed in substance as follows:

Carter-Crane will not knowingly do, or omit doing, any act which will cause cancellation of the contract of April 25, 1919, as modified. And Carter-Crane grant to Streeter-Amet the "exclusive" right or license to "manufacture and sell, rent or otherwise dispose of the devices," constructed in accordance with said inventions and which come within the terms of the contract of April 25, 1919, as modified, "within and throughout the United States and its possessions and not elsewhere." Streeter-Amet will manufacture said devices in a good and workmanlike manner, etc., and "use its best endeavors to satisfy the demands of the users of the devices." All drawings, patterns, dies, jigs, etc., turned over by Carter-Crane to Streeter-Amet, or made by Streeter-Amet, shall be the property of Carter-Crane. Streeter-Amet "will produce, offer for sale, and pay royalties on, as many devices as it can induce the trade to take" in the United States, its possessions and in Canada,—it being understood that "any specific minimum for each year shall remain an open question until January 1, 1924, when a proper and fair minimum for each year thereafter may be mutually agreed upon." Streeter-Amet will account to Carter-Crane, quarterly each year, showing number of devices constructed, sold or used during the preceding quarter and will "include royalty payments of ten (10) per cent of gross list sales price to ultimate consumer for each device sold or used other than for demonstration purposes." Carter-Crane do not warrant the validity of the patents, or that articles accompanying the inventions do not infringe other patents. In case of infringement of the Crane patents by others, Carter-Crane will prosecute infringement suits at their own expense if requested by Streeter-Amet so to do, but such expense shall not exceed the amounts of royal-

ties received from Streeter-Amet during the pendency of such suits. Streeter-Amet may, at its own expense, prosecute suits for infringements of the Crane patents and may retain all profits or damages received from such prosecution. Carter-Crane will assist Streeter-Amet in the defense or prosecution of suits involving said inventions.

The contract between Crane and Carter-Crane of April 25, 1919, was further modified by another agreement between them, dated March 31, 1924, in which the parties agreed in substance as follows:

That Carter-Crane shall dismiss a suit commenced by them against Crane in the superior court, No. 382773,—the same having been settled; that Crane shall turn over to Carter-Crane "the improvements in the device which he has in mind for types 'A' and 'B' doors, which improvements will greatly cheapen the cost of such controls"; that on such new and improved devices Crane "shall receive 40% of the total royalty payments coming to Carter-Crane, instead of the 30% which he gets on all other devices, including the present device, and that when the total royalties going to Carter-Crane, exclusive of those paid to Crane amount to $25,000 (being the sum incurred in developing the present door control devices), then Crane shall receive 50% of the gross royalties paid on the new and cheap controls for types 'A' and 'B' doors herein referred to, it being understood that no change is made in the present scale of royalties other than as herein stated"; and that as long as Carter-Crane, or their assignees, receive any income or returns from the manufacture or sale of said devices, even after patents have expired, Crane's interest shall remain as herein set forth.

Inasmuch as new and strong competition from other and cheaper door control devices has been developed during the past two years, and the development of the

Carter-Crane devices has been hindered by disputes and other causes operating to the injury of the market for the devices, and as neither Streeter-Amet (now manufacturing and selling those devices) nor any other responsible manufacturer is now willing to do more than its very best to create and supply the demand for such devices, ''it is agreed that the fixing of *any* specific minimum scale of royalties under the contracts of April 25, 1919 and April 17, 1922, now existing between Carter-Crane and Crane, *is hereby waived.*''

If for any reason the contract of April 17, 1922, between Carter-Crane and Streeter-Amet, is terminated, then Carter-Crane ''shall have the right and power to contract if possible with any other responsible manufacturer for the making and selling of said devices upon such terms and conditions as they may see fit, *provided* that said contract shall comply, as far as the interests of Crane are concerned, with the provisions of the agreements of April 25, 1919 and April 17, 1922, and this agreement.''

The following facts in substance appear from the evidence, oral and documentary, as contained in the present transcript:

The devices involved are electrically operated for opening or closing heavy doors in garages, manufacturing plants, etc. They are expensive to make and were sold by Streeter-Amet for slightly over $250 each. The best field for sales was in public garages and in those connected with large apartment buildings or hotels. Practically no sales could be made for use in private garages on account of the price. Prior to the execution of the contract of April 17, 1922, Carter-Crane applied for patents in Great Britain and other European countries. Investigation disclosed that in none of those countries was there a good field for the sale of the devices and large annual fees had to be paid for the patents. It was decided to withdraw the ap-

plications, or, where patents had been obtained, to relinquish them. Crane was advised of the situation and given the opportunity to take out patents in the European countries in his own name, but he declined. The situation caused the limitation, in the license contract to Streeter-Amet, to the United States and Canada. Up to April 17, 1922, Carter-Crane had expended about $25,000 in the development of the devices. This fact is referred to in the contract of March 31, 1924, signed by Crane. After April 17, 1922, from time to time, Streeter-Amet expended over $50,000 in making drawings and dies, jigs, etc., for the manufacture of the devices, and in the printing and distribution of catalogues, circulars, etc., advertising the devices. It also employed three special salesmen and established selling agencies in many cities in the United States. As testified by its president, Henry F. Reck, it in good faith endeavored to promote sales throughout the United States and Canada to the best of its ability. It at all times kept up with the demand and never was unable to fill an order for lack of a device ready for delivery. It ascertained that Canada was not a good field for sales. It, however, established local agencies in the larger cities of the Provinces of Ontario and Quebec. A few of the devices were sold in Windsor, Ontario. After it had been engaged in the sale of the devices for a year or so other concerns put upon the market other cheaper devices which accomplished similar results, and competition became keen. This fact is mentioned in the contract of March 31, 1924, signed by Crane. Streeter-Amet's sales of the devices gradually increased up to the year 1926, but thereafter decreased. In 1922, 121 devices were sold; in 1923, 148 devices; in 1924, 179; in 1925, 173; in 1926, 205; in 1927, 115; in 1928, 76.

About April 17, 1922, Crane was employed by Streeter-Amet at a salary of $200 a month. His duties

were to service and repair devices for which Streeter-Amet made charges to customers. He continued to perform these duties until July 16, 1927, when he was discharged. Prior to his discharge he did considerable service and repair work for which he did not account to Streeter-Amet, but himself collected the charges and retained the moneys. He also secretly sold 10 or 12 second-hand devices, at prices considerably less than the prices for new ones, and collected and converted to his own use the moneys received therefor. These second-hand devices accomplished the same results as new ones, and the sales were made to prospective buyers of new devices. When Reck, president of Streeter-Amet, learned of the fact that Crane had made two of such sales he complained to him. Crane did not advise Carter-Crane that he was making such sales. In March, 1927, there was some talk between Reck and Crane as to Streeter-Amet either giving up its license or buying out the interests of Carter-Crane and Crane. Under date of June 21, 1927, (before Crane's discharge) Reck wrote Crane that the directors of Streeter-Amet had recently discussed the subject of buying out Carter-Crane and Crane but that, "due to a very marked falling off in the door control business and because . . . there is little possibility of developing the business on a large scale," the directors had decided not to make the purchase. And Reck in the letter suggested that, if Crane could find some other concern to take over the manufacture and sale of the devices under license, in all probability a termination of the existing Streeter-Amet license could be brought about on certain stated terms. Nothing came of the negotiations and Streeter-Amet continued to manufacture and sell the devices under its license. About August, 1927 (after his discharge), Crane perfected an improved device and made application for a United States patent. He did not notify Carter-Crane

of these facts until several months thereafter. In September, 1927, he commenced the manufacture by himself and the sale *for his own account,* of the new device. He sold some at $175 each, and others at $200 each—considerably less than the prices as charged by Streeter-Amet for the original device. Up to May, 1929, he continued to himself manufacture and sell the new devices, having sold during the period a total of forty-two (42) of such devices. They included some of the features for his original patents—the arm or lever being practically the same though shorter. They are more simple and less expensive to manufacture than the old devices. Crane was fully aware when he manufactured and sold these new devices that Carter-Crane, or its sublicensee, Streeter-Amet, had the exclusive right to manufacture and sell the same, as provided in the contracts.

On September 7, 1927, Crane served a notice, dated September 1, 1927, upon Carter-Crane and Streeter-Amet, to the effect that they were in default under the contracts "in failing to pay royalties," and of his intention to cancel and terminate the contracts for that reason. In the latter part of October, 1927, Carter, one of the trustees of Carter-Crane, saw in operation one of Crane's new devices, which Crane had sold, and he (Carter) was favorably impressed with it. According to Carter's testimony, he told Crane that the latter under the contracts should have informed Carter-Crane of the invention and that Crane's manufacture and sale of the new devices on his own account was a violation of the contracts and injured the business of Carter-Crane and Streeter-Amet; that Crane replied that he was acting under the advice of counsel and that he "needed the money"; that on the same day Carter told Reck to send a draftsman to make drawings of the new device, which drawings Crane did not have, and that Streeter-Amet ought to manufacture

and sell the new device; that after receiving a preliminary drawing from the draftsman and a report as to the approximate time and expense required to construct dies, jigs, etc., Reck estimated that the cost of complete working drawings, and the making of the necessary dies, jigs, etc., would be about $10,000; and that Reck was not inclined under existing circumstances to make such expenditures. According to Reck's testimony the reason for his unwillingness to have Streeter-Amet incur such an expenditure, and begin the manufacture and sale of Crane's new device, was the fact that Crane had served the notice of his intention to cancel, if he could, the existing contracts, and, hence, he (Reck) did not think it wise to make any new outlays until it was decided whether Crane could or could not legally cancel said contracts. Carter, assenting to Reck's position, did not further urge Streeter-Amet to make such expenditure for the present or take on the manufacture and sale of the new devices.

On November 12, 1927, Crane filed a bill in the superior court against Streeter-Amet and Carter-Crane, praying that both render an account and pay to him "accrued royalties due," to be ascertained on the accounting; that the contract of April 25, 1919, be rescinded "for lack of performance and as being against public policy and unconscionable"; that the contract of April 17, 1922, be rescinded "as being without consideration and for fraud and misrepresentation"; that the contract of March 31, 1924, be rescinded "as being without consideration and procured by duress"; and that Streeter-Amet and Carter-Crane be enjoined from interfering with Crane in carrying on his lawful occupation, etc.

On January 7, 1928, on Crane's motion, the bill was dismissed as to Streeter-Amet. On the same day Crane filed a supplemental bill, alleging that "under

date of September 1, 1927'' he gave written notice to Carter-Crane of its ''failure to pay royalties''; that it had not ''during the succeeding 90 days'' corrected the default; that ''since December 1, 1927, the date of the expiration of said 90 day period,'' he had given to Carter-Crane ''due notice of said default and of the *cancellation* of said contracts''; that the 30-day period after December 1, 1927, allowed to Streeter-Amet, has now expired ''without payment to or offer to pay said Crane *for the royalties in arrears''*; that the contract of April 25, 1919, provided that, in case of termination of the contract, Carter-Crane would turn over to Crane a complete set of drawings and specifications and ''the patterns, jigs and dies employed in the manufacture of the devices''; that Crane is able to make manufacturing or license arrangements with another concern, and ''he must have said drawings, patterns, jigs, dies, etc., the denial of which from Carter-Crane is causing him irreparable damage.'' The prayer of the supplemental bill was to the same effect as the original, with the addition that the court order that said drawings, patterns, jigs and dies, etc., be turned over to Crane. On November 10, 1928, the three trustees of Carter-Crane filed an answer to the bill and supplemental bill. They admitted the execution of the contracts and the payment of royalties to Crane; denied that any of the contracts was procured by misrepresentations, fraud or duress, or that any royalties were unpaid, or that Carter-Crane was in default in any manner, or that Crane had given *due* notice of his intended cancellation of the contracts, or that he was entitled to any relief; and alleged that the falling off in the sales of the devices was largely due to Crane's failure to perform the contract on his part.

On July 2, 1928, while Crane's action was pending, the trustees of Carter-Crane filed their original bill against Crane in the present case. It was superseded

by an amended bill, filed October 16, 1928, in which the contracts were set forth in full. Complainants alleged that they had expended more than $25,000, and Streeter-Amet a larger aggregate sum, in developing the manufacture and sale of the devices; that, in violation of the provision in the contracts and of complainants' rights, Crane had sold to certain individuals or corporations (naming them) devices covered by the patents, had installed the devices and had appropriated to his own use the proceeds; and that he was discouraging others from purchasing the devices manufactured by Streeter-Amet. The bill also set forth the fact of Crane's service on Carter-Crane on September 7, 1927, of the notice that Carter-Crane was in default "in payment of royalties" and of his intention to cancel the contracts for that reason, and further alleged that on November 5, 1927, Crane served upon them a further notice that he was about to file a bill for the cancellation of the contracts because of "failure of performance," because the contracts "were procured by fraud and duress," and because they "were unconscionable"; that on December 2, 1927, he served a further notice upon them that, because of their "failure to pay royalties," all the contracts "had been terminated"; that Crane was wrongfully claiming that the contracts had been terminated, and that he was wrongfully giving out to the trade that Streeter-Amet had no longer any right to manufacture or sell the devices, to complainants' great damage; and that as a matter of fact said contracts were still legally in force and effect. The bill prayed that the court decree that the contracts were still in full force, and that Crane, his agents and attorneys, be restrained by injunction from giving out to the trade and others that said contracts were no longer in force, and from in any manner discouraging prospective purchasers from purchasing the devices from Streeter-Amet, and from in any manner threatening said purchasers. On Octo-

ber 26, 1928, Crane filed his answer admitting the giving of the notices, denying that the contracts were in force, and alleging that complainants were not entitled to the relief as prayed, or any relief.

On November 16, 1928, *both* causes (Crane's suit and complainants' suit) came on for trial before the chancellor. By agreement evidence was first introduced in Crane's suit during which he testified at length in his own behalf and one witness for him. He also introduced certain written evidence. In defense of Crane's suit, two of the trustees of Carter-Crane testified; also Reck, president of Streeter-Amet; and other writings were introduced. The trial of Crane's suit was finished on November 20, 1928, and it was stipulated that the evidence, taken therein, might in the subsequent trial of complainants' suit be considered in that suit, "so far as material." The hearing of complainants' suit did not, however, commence until May 17, 1929.

On November 23, 1928, the court entered a decree in Crane's suit dismissing his bill and supplemental bill "for want of equity." In the decree the court found that Crane "offered no evidence that any of the contracts were executed by him as the result of any fraud, misrepresentation or duress, or that they were unconscionable, or against public policy, or without consideration"; that Crane's notice, dated September 1, 1927, of alleged default and of his intention to cancel the contracts, was not actually served upon Carter-Crane until September 7, 1927; that under the contracts, after *delivery* of such a notice, Carter-Crane had the right for 90 days to cure any claimed default; that Crane's further notice, dated and served upon Carter-Crane on December 1, 1927, and stating that because of Carter-Crane's failure to cure the default he had elected to and did cancel the contracts, was delivered to Carter-Crane at a date less than 90 days after Crane's first notice was delivered; and that

Crane's said notice of December 1st of cancellation and forfeiture of the contracts was "ineffectual and void."

On October 1, 1928, before said decree had been entered, Streeter-Amet, by Reck, wrote Carter-Crane to the effect that, because of Crane's formal notice of December 1, 1927, canceling the contracts, and because he was giving out to the trade that such contracts had been canceled and Streeter-Amet's right to manufacture and sell the devices had ceased, Streeter-Amet's business in selling the devices had been seriously injured, and that Streeter-Amet had concluded that, under its contract of April 17, 1922, it "was not obligated to submit further to this situation." The letter gave formal notice to Carter-Crane that it would, from and after December 1, 1928, cease all operations under its contract.

On November 26, 1928 (three days after the entry of said decree against Crane), Carter-Crane, by Carter, for the first time replied to Streeter-Amet's letter and notice, stating that they had not theretofore made reply as they had anticipated an early determination of Crane's suit against them, that said suit had finally been decided in their favor, that they were not responsible for Crane's actions in attempting to cancel the contracts or giving out to the trade that the same had been canceled, and demanding that Streeter-Amet continue, in accordance with its contract, to manufacture and sell the devices. There was further correspondence, and on December 8, 1928, Carter-Crane wrote Streeter-Amet requesting that it *temporarily* accept and fill all orders for the devices, and agreeing that compliance therewith on the part of Streeter-Amet should be without prejudice to any claims arising between them. Streeter-Amet complied with the request and continued to manufacture and sell the devices. For the period from January 1 to May 31, 1929, it received from sales of devices the aggregate sum of about $5,000; and accounted for the same.

On November 26, 1928, also, Crane served upon Carter-Crane *new* notices of his intention to terminate the contracts of April 25, 1919, and April 17, 1922, not upon the ground of "failure to pay royalties" as stated in his former notice of September 7, 1927, but upon *other* grounds for the first time stated, viz., failure on the part of Carter-Crane (a) "to use due diligence in developing the market both at home and abroad for door control devices"; (b) "to manufacture in quantities sufficient to meet the trade demand"; and (c) "to institute or prosecute in good faith any suit or suits for infringement of the patents included in said agreements, notwithstanding the fact that numerous infringements have been or are taking place." None of the new notices was served upon Streeter-Amet.

After the temporary arrangement had been made in December, 1928, between Carter-Crane and Streeter-Amet, Carter-Crane, knowing that Streeter-Amet desired to discontinue the manufacture and sale of the devices, and having in mind the provision of the contract of March 31, 1924 (that in the event of the termination of the Streeter-Amet contract it had the right to contract with any other responsible manufacturer for the making and selling of the devices, etc.), at once entered into negotiations to that end with numerous manufacturers. They found several such manufacturers who were willing to do that work upon the proposed terms, but none was willing to consummate any contract with Carter-Crane until the pending litigation was ended.

On January 7, 1929, complainants filed their amended and supplemental bill against Crane, in which they repeated the allegations of their amended bill of October 16, 1928. They also alleged the fact of Crane having served on November 26, 1928, his *new* notices of intention to terminate the contracts because of Carter-Crane's claimed defaults as therein stated for the first

time. They also alleged facts showing that Carter-Crane were not in default in any of the particulars as stated. They further alleged that Crane, during the past two years, had improperly endeavored to deprive them and Streeter-Amet of their rights under the contracts, in order that he (Crane) might secure the benefit of the large sums of money which Carter-Crane and Streeter-Amet had expended in the development of the business, that Crane had frequently threatened that he would, in one way or another, terminate said contracts; that Crane's acts had caused irreparable damage to complainants; that they had no adequate remedy at law; and that Crane was financially unable to respond to any suits by complainants for damages for Crane's breaches of the contracts and for his unlawful acts. The bill prayed for an injunction restraining Crane, his agents and attorneys, from giving out to the trade or claiming that said contracts are not in full force; from further attempting to terminate the contracts and from discouraging prospective purchasers of the devices from the purchase or use of the same and from threatening such purchasers; and for further relief. After Crane's demurrer to the bill had been overruled he filed an answer.

On March 28, 1929, Crane served upon Carter-Crane a written notice to the effect that, because of Carter-Crane's defaults in their obligations under said contracts (as stated in Crane's notice of November 26, 1928), he has canceled and terminated all of them, and that, in view of such termination he demanded "compliance with the terms of paragraph 13 of said contract of April 25, 1919." The paragraph referred to provides that "in case of termination hereof by default, or otherwise," Crane shall receive from Carter-Crane "one complete set of each active drawing, specification and pattern," as may be in use at time of such termination, "together with all jigs and dies employed in the manufacture of the devices."

On April 3, 1929, complainants filed their supplemental bill, setting forth the service upon them on March 28 of Crane's notice of his termination of the contracts and demand for the property mentioned. They alleged that by reason of the notice Crane now is claiming that the contracts are no longer in force and is so informing the trade and others; that complainants are not in default; and that Crane is not entitled to cancel the contracts or to claim that they have been terminated. The prayer of the bill, as to the injunctional relief asked, is substantially the same as in the amended and supplemental bill above-mentioned, and there is the additional prayer that the court decree that the contracts have not been canceled or terminated by Crane, and that Crane's said notice of March 28, 1929, is void and of no effect. Crane's answer was ordered to stand to the supplemental bill.

On the hearing of complainants' suit, which was begun in May, 1929, a mass of evidence, oral and documentary, was introduced by both parties. Reck, president of Streeter-Amet, and Carter and Benson, two of the complainants, testified at length for complainants. Crane was called as a witness for them. And complainants introduced in evidence the pleadings and decree, as above-mentioned, in Crane's suit against them. For defendant Crane testified in his own behalf as did three other witnesses. Reck was called as a witness for Crane and gave further testimony.

In addition to the facts, as above outlined in this opinion, the following other facts were disclosed: After the contracts of April 17, 1922, were executed, Carter-Crane, through the efforts of Carter, assisted Streeter-Amet in advertising the devices and in stimulating sales. Through Carter's efforts many sales were made, including a number of devices to the new Union Station at Chicago and to the Ford automobile plant at Detroit. Carter-Crane, as well as Streeter-

Amet, diligently and in good faith pushed the sales of the devices. When, because of Crane's breaches of the contracts and the strong competition which had developed, Streeter-Amet gave notice that it would cease, on December 1, 1928, to manufacture and sell the devices, Carter-Crane used their best efforts to prevent it from so doing, made the temporary arrangement as above stated for it to continue making sales, and immediately started negotiations to procure another responsible manufacturer to take the place of Streeter-Amet, and pushed those negotiations as far as possible in view of Crane's notices and the pending suit.

As to the issue concerning infringements by others of the Crane patents and the prosecution by Carter-Crane of such suits, the evidence does not disclose numerous infringements, as claimed by Crane, or any default on the part of Carter-Crane or Streeter-Amet in prosecuting any suit or suits. No notice of any claimed infringement was given by Crane or any request made by him to bring a particular suit. Furthermore, Crane had the right under the contract of April 25, 1919, in case of *refusal* by Carter-Crane to bring an infringement suit, to himself bring it, and in the event of the successful termination thereof he would be entitled to retain all profits or damages recovered. It appears that in 1926, Streeter-Amet, by its Chicago patent attorney Lotz, commenced one infringement suit in the United States Court at Minneapolis, Minnesota, but that the suit was not very vigorously prosecuted. One of the reasons was that, from the defendant's answer in the suit, it appeared that there was some doubt whether Crane's patent sued upon was a valid one, in view of the prior art as disclosed in said answer. Lotz was of the opinion that it was the better policy not to press the suit to trial and his advice was followed,—Reck telling Lotz to use his best judgment

in the matter. It does not appear that Crane made any objections to this course.

After a careful consideration of the provisions of the contracts, the breaches by Crane, and all the facts and circumstances as disclosed by the evidence, we are of the opinion that complainants were not in default under the contracts for any of the reasons as stated in Crane's notice of November 26, 1928; that Crane could not legally or equitably terminate the contracts on March 28, 1929, and the same were not then terminated; and that the trial court erred in dismissing complainants' bills for want of equity. In *Palmer v. Ford,* 70 Ill. 369, 377, it is said: "Forfeitures are not regarded by courts with any special favor. The party who insists upon a forfeiture, must make clear proof, and show that he is entitled to make such declaration. It is a harsh way of terminating contracts, and not infrequently works great hardships." (See, also, *Jones & Dommersnas Co. v. Crary,* 234 Ill. 26, 30; *Gessler v. Erwin Co.,* 182 Wis. 315; *Schweyer, etc., Co. v. Regan Safety Devices Co.,* 4 Fed. Rep. (2d) 970.) In *Barnett v. Q. & C. Co.,* 226 Fed. Rep. 935, 940, it is said: "The modified exclusive license under a patent is a unique property right, against the destruction of which a court of equity will give protection by injunctive relief." And we think that the court, in view of all the facts and circumstances in evidence, should have decreed that the contracts were in full force and effect and should have granted an injunction against Crane in substantial accord with the prayers of complainants' amended and supplemental bill and supplemental bill.

Accordingly, the decree of the superior court of June 27, 1929, dismissing complainants' bill for want of equity, is reversed, and the cause is remanded to the superior court with directions to enter a decree to the effect that Crane's attempted forfeiture and termination of the three contracts between the parties

(dated respectively April 25, 1919, April 17, 1922, and March 31, 1924) are void and of no effect, and that the defendant, Crane, his agents and attorneys, be enjoined and restrained from claiming or giving out to the trade or others that said contracts are no longer in force, from discouraging any and all persons, firms or corporations from purchasing the door control devices mentioned in said agreements from complainants or their sublicensees, or from using the same, and from in any manner threatening such purchasers or users.

*Reversed and remanded with directions.*

BARNES, P. J., and SCANLAN, J., concur.