No. 34,974

Earle M. Moore, *Appellant*, v. Iva G. Hayter and Georgie Moore, Trustees and Executrices of the Estate of George Godfrey Moore, Deceased; Georgie Moore, Widow of George Godfrey Moore, Deceased; Iva G. Hayter et al., *Appellees.*

No. 34,975

In the Matter of the Estate of George Godfrey Moore, Deceased. (Appeal of Earle M. Moore from Order of Probate, Earle M. Moore, *Appellant*, v. Iva G. Hayter et al., *Appellees.*)

No. 34,976

In the Matter of the Estate of George Godfrey Moore, Deceased. (Claim of Earle M. Moore, Certified to the District Court, Earle M. Moore, *Appellant*, v. Iva G. Hayter et al., *Appellees.*)

(108 P. 2d 495)

2

Opinion filed December 28, 1940.

*Robert Stone, James A. McClure, Robert L. Webb, Beryl R. Johnson, Ralph W. Oman,* all of Topeka, and *R. F. Hayden,* of Los Angeles, Cal., for the appellant.

*Clayton E. Kline, M. F. Cosgrove, Balfour S. Jeffrey, Robert E. Russell* and *C. A. Magaw,* all of Topeka, for the appellees.

The opinion of the court was delivered by

DAWSON, C. J.: The first of these appeals is from a judgment denying specific performance of an oral contract to devise and bequeath real and personal property. The second and third of these appeals are merely formal. Counsel for the parties have stipulated as to their eventual disposition and they will require no present attention.

In the principal appeal, No. 34,974, the record is interminably long. The abstract extends to 250 pages, the counter abstract to 133 pages; and the briefs and reply briefs to 261 and 288 pages, respectively. However, as space must be given to the trial court's findings of fact, and they cover the essential features of the controversy comprehensively, our preliminary statement of the case will be held within narrow compass.

The late George Godfrey Moore, of Topeka, died testate on March 15, 1939. He had been successfully engaged in the business of life insurance for many years. About twenty years ago he founded the National Reserve Life Insurance Company and served as its president until his death. He was survived by his widow, Georgie Moore. He had no children. His nearest relatives were two sisters, several nieces and nephews, one of whom was Earle M. Moore, plaintiff herein.

In 1930 Earle M. Moore, then 33 years of age, was a resident of Los Angeles and for five years he had been engaged in the life insurance business as a representative of the Equitable Life Assurance Society of New York. His position with that company was a desirable and lucrative one and gave promise of progressive advantages if he should continue in its employment.

About that time, George Godfrey Moore, then about 58 years old,

began to evince some concern about who should follow him as president of the company he had founded. He conceived the idea that the plaintiff, who was his nephew and bore the same family name and who was already making headway as an insurance man, might be trained and fitted to be his successor as president of the National Reserve Life Insurance Company. In certain letters to the plaintiff written by George Godfrey Moore in 1930, set out in the trial court's findings of fact (F. 6), George called Earle's attention to the fact that he had no son to carry on after he should die or resign and that he would like to aid somebody of his own name and kindred to qualify for the presidency of his insurance company. This subject was discussed in correspondence between uncle and nephew, and led to the latter's coming to Topeka, where they reached an agreement which, unfortunately, they did not reduce to writing—hence, this lawsuit.

Nevertheless, the evidence to prove that agreement, though emphatically disputed, was sufficient to prove its substance—which was that Earle Moore should sever his connection with the Equitable Company in California and become identified with the National Reserve Life Insurance Company and should for a time become its representative in Kansas City, Mo., and that he should later come to the Topeka headquarters of the company and familiarize himself with its executive and administrative affairs. In consideration for making this change in his mode of life and residence and for qualifying himself to succeed his uncle as president when the latter should die or resign, the uncle promised to bequeath to his nephew, plaintiff herein, his large holdings of stock in the insurance company and to devise to him also his fine home place—a mansion and its contents and 40 acres of land near Topeka—conditioned, however, that the use and enjoyment of the home place and the income of the stock should inure to Georgie Moore, wife of George Godfrey Moore, for the term of her natural life if she should survive her husband. Pursuant to this agreement Earle M. Moore left California, took up his abode in Kansas City, Mo., and opened an office in that city for the National Reserve Life Insurance Company. For his services to the company he received a salary and an office expense allowance. Plaintiff spent the years 1931 and 1932 in Kansas City, Mo. Then his uncle brought him to Topeka, caused him to be elected director and vice-president of the company and put him in charge of some of its important affairs.

In apparent compliance with the foregoing oral agreement of the parties, in the autumn of 1931 some months after plaintiff had entered the service of his uncle's company in Kansas City, George Godfrey Moore made and executed his will. In it he bequeathed his insurance stock and devised his home place to plaintiff, subject to a life use and the enjoyment thereof to his wife. She signed her written consent thereto, and both the testator and wife initialed or signed each page of the will and it was formally attested by two witnesses. (Modified F. No. 9.)

The plaintiff continued in various capacities in the service of the National Reserve Life Insurance Company in Topeka for the next three years; but about December 15, 1935, he resigned, and on January 1, 1936, he severed his connection with it, and returned to California, where he opened an agency for the Minnesota Mutual Life Insurance Company, and has been so engaged since that time.

On November 22, 1938, nearly three years after Earle Moore severed his connection with his uncle's company, the latter made a new will revoking "any and all former wills." In it the testator made a lengthy testamentary disposition of his considerable fortune and estate to his widow and to relatives and many other beneficiaries; but it did not mention the plaintiff nor the oral agreement which the testator and plaintiff had made in 1930. This will was admitted to probate shortly after the testator's death, and the named executrices, Iva G. Hayter and Mrs. Georgie Moore, qualified thereunder.

· Some months later, on September 15, 1939, this action for specific performance was begun. Plaintiff joined as defendants the executrices and the legatees and beneficiaries under the testator's will. His petition pleaded the pertinent facts and alleged that one of the defendants, Iva G. Hayter, had long been employed by George Godfrey Moore as his stenographer and private secretary and that he had caused her to be elected as director of the insurance company and also as its secretary-treasurer; that she was a woman of intelligence and ability and that she had acquired great influence over George Godfrey Moore in both his business and private affairs; and after plaintiff was brought from Kansas City to Topeka to have charge of certain of the company's affairs, she persistently interfered with his work, demoralized the agency force under his charge and destroyed his efficiency; that he frequently protested to George Godfrey Moore about Miss Hayter's interference with his work—

"But he [the testator] was unwilling or unable to disturb his business relations with defendant Hayter and to prevent her interference with the activities of the plaintiff. The situation became so intolerable that finally plaintiff told his uncle that it was impossible for him to do his best work and it was not to the best interests of the company that he should continue in connection with the home office unless the situation could be changed. The uncle agreed that the situation was intolerable on account of interference with plaintiff by defendant Hayter as aforesaid, and it was then and there agreed between the plaintiff and his uncle that until it should become desirable or necessary for him to become executive head of said company, plaintiff might withdraw temporarily from the employment of the company and resume business on his own account elsewhere, but it was understood by and between them that this should not in any way violate or abrogate the original contract between the plaintiff and his uncle or that it should amount in any way to a waiver or relinquishment on the part of plaintiff of his rights which had accrued thereunder, which had been fully earned and vested in the plaintiff by reason of the fact that he had done and performed all that under said contract with his uncle was required of him to be done thereunder.

"Thereupon, the plaintiff, with his uncle's consent, on or about the first day of January, 1936, returned to California where he opened an agency under another insurance company. This was with the full knowledge and consent of his uncle, who never then or thereafter advised the plaintiff by word or conduct in any way that he was dissatisfied with his departure or intimated that he would not carry out his part of the contract."

Plaintiff concluded his petition with a prayer for specific performance of the contract of 1930 and for other equitable relief.

Defendants answered with a general denial, certain admissions, and specifically alleged that—

"If plaintiff ever had a contract with George Godfrey Moore, as alleged in his petition, which these defendants specifically deny, said contract was breached, abandoned and renounced by plaintiff, and by reason of such breach and abandonment plaintiff is not entitled to recover in this action."

They further answered that plaintiff had been paid in full for all services rendered by him to the National Reserve Life Insurance Company, and that he had rendered no services to George Godfrey Moore and that the latter had received no consideration for the alleged oral contract.

Defendants also pleaded the statute of frauds as against the enforcement of an oral contract to devise real estate, and that if any such contract existed as alleged it was breached on or before January 1, 1936, by George Godfrey Moore, and that an action on the alleged contract accrued on or before that date and hence was barred by the statute of limitations when this action was begun, September 15, 1939.

On these issues the cause was tried by the court without a jury. The evidence took a wide range and went into many details, all of which this court has read assiduously. The trial court's findings of fact, somewhat abridged, were these:

"FINDINGS OF FACT

*No. 1*

"Plaintiff is a resident and citizen of Los Angeles, Cal., and was the nephew of George Godfrey Moore, now deceased. The defendants Iva G. Hayter and Georgie Moore are . . . the duly appointed, qualified and acting executrices and trustees of the estate of George Godfrey Moore, deceased, who, at the time of his death, was . . . a resident of Shawnee county, Kansas . . .

*No. 2*

"George Godfrey Moore died testate on March 15, 1939. At the time of his death he was 67 years of age. He had no children, but left surviving him his widow, Georgie Moore. His nearest relatives were two sisters, Hanna Moore Krammes and Mabel Moore Keefer; three nephews, . . . and two nieces, . . .

*No. 3*

"At the time of his death, and from the date of its organization, George Godfrey Moore was president of the National Reserve Life Insurance Company, a Kansas corporation. In 1939 such company had a paid-up capital of $550,000, divided into 55,000 shares of common stock, each having a par value of $10. The home office of the company is located in the city of Topeka, . . .

*Modified No. 4*

"That for several years prior to May 1, 1930, plaintiff, Earle Moore, resided in Los Angeles, Cal., with his wife, Merle Moore, and had been for about five years engaged in the life insurance business and was an assistant agency manager of the Equitable Life Assurance Society of the United States, and his average net receipts from first-year commissions, a salary and renewal commissions, from the Equitable Life Assurance Society for the years 1928, 1929 and 1930, were $5,092.65, in addition to which compensations he was entitled to receive certain renewal commissions from said Equitable Life Assurance Society . . . and . . . from the Peoria Life Insurance Company . . .

*No. 5*

"In 1930 George Godfrey Moore was about 58 years of age, and he and his wife resided in their home known as Georgian Court, . . . in Topeka and [which] consists of 40 acres of valuable land, with a dwelling house located thereon, which was well furnished and contained, among other things, a valuable library. He was deeply interested in the affairs of the National Reserve Life Insurance Company and was proud of his position as president of the company and the part he had taken in its organization and life, and was ambitious to be succeeded as president of the company by a relative of the same name who would have a knowledge of the insurance business, the intelligence and the force fitting him to be executive head of the company.

### No. 6

"On May 1, 1930, George Godfrey Moore wrote to the plaintiff a letter in which, among other things, he said:

" '. . . I have thought several times of whether or not it wouldn't be to your best interests to be associated with the National Reserve Life Insurance Company. You know some time or other it is going to be necessary for me to get out of the business. However, I hope it will be a long time and should anything happen to me the probabilities are that you will be remembered in a very substantial way . . .'

" '. . . What would you think of coming to Topeka with the idea of working into an executive position . . . If you could measure up to the requirements in a reasonable time you could have the opportunity of becoming the head of the company.'

"On May 14, 1930, George Godfrey Moore wrote to the plaintiff a letter, in which, among other things, he stated:

" 'Unfortunately for my estate I have no children and consequently I will have no one to carry on for me. So I naturally feel if I can be the means of aiding anyone that is any relation to me and who deserves it, I should do so. That is the reason I wrote you along the lines that I did.'

### No. 7

"In September, 1930, the plaintiff, Earle Moore, accompanied by his wife Merle Moore, visited George Godfrey Moore in Topeka, . . . During this time the project of the National Reserve Life Insurance Company being admitted to do business in the state of California was discussed between plaintiff and George Godfrey Moore. During this visit Earle Moore agreed to open and manage an agency office for the insurance company in California whenever the company was admitted to do business in that state, for which George Godfrey Moore agreed that the National Reserve Life Insurance Company would pay him a salary of $6,000 per year and other compensation. At the same time it was agreed between the two that after plaintiff had so operated the company agency in California for several years he was to come to Topeka and work for the life insurance company in the home office in different managerial and executive positions, to the end that such experience and position would fit him to be president of the insurance company and to succeed George Godfrey Moore as head of the company. At the same time George Godfrey Moore agreed to leave to plaintiff, by will, the stock he owned in the National Reserve Life Insurance Company at his death, subject to the right of Georgie Moore to receive the income from such stock during her life; and also to will to plaintiff a 40-acre tract of land known as Georgian Court, with the residence thereon and its contents, subject to a life estate in Georgie Moore. It was intended by this agreement that the association of plaintiff with the National Reserve Life Insurance Company was to be permanent and to continue until the death of George Godfrey Moore or until his retirement from the presidency of the company.

### No. 8

"Thereafter, in the fall of 1930, . . . because said company was not admitted to do business in California, said parties in December, 1930, modified said agreement by agreeing that the plaintiff, Earle Moore, should open and

conduct an agency of the company in Kansas City, Mo., instead of California, and should receive a salary for his services of $4,200 per year and commissions and renewals as set out in a written contract between plaintiff and the National Reserve Life Insurance Company dated February 9, 1931, . . . and also additional compensation of $100 per month to be paid by George Godfrey Moore.

### Modified No. 9

"In the fall of 1931, pursuant to the agreement of September, 1930, between plaintiff and George Godfrey Moore, a will was executed by George Godfrey Moore, wherein he devised to the plaintiff his stock in the National Reserve Life Insurance Company and the 40-acre home tract, referred to as Georgian Court, together with its contents, at the death of Georgie Moore, and Mrs. Georgie Moore was to have the income from the stock during her life. Such will was signed by George Godfrey Moore, and his wife Georgie Moore signed a written consent thereto; and each page of said will was either initialed or signed by both George Godfrey Moore and his wife, Georgie Moore, and such will was attested by two witnesses.

### No. 10

"In February, 1931, plaintiff entered upon his services with the National Reserve Life Insurance Company under the written contract of February 9, 1931, established a branch office for that company in Kansas City, Mo., and remained in charge thereof until November, 1932, when the office was closed. During this period he was elected a director of the company.

### No. 11

"In November, 1932, plaintiff came to the home office of the Insurance Company in Topeka pursuant to the original plan contemplated by the parties under their agreement and was appointed agency manager of the company at its home office. He remained in the Topeka office until approximately January 1, 1936. During this period of time he was elected vice-president and acted as superintendent of agents, having charge of all the company's agents in the various states wherein the company operated, which offices, together with that of director of the company, he held until January 1, 1936.

### No. 12

"During the five years that the plaintiff remained in the employ of the National Reserve Life Insurance Company he familiarized himself with the affairs of said company and became acquainted with all departments of said company's business. He was a member of and served on the' underwriting committee and was frequently called into conferences concerning the investments of the company; and was appointed to and did manage and have under his control the company's largest investment, the National Reserve Building, located in Topeka, Kan., and learned all the details of the company's business.

### No. 13

"The defendant Iva G. Hayter was the secretary-treasurer of the National Reserve Life Insurance Company during the period of plaintiff's employment. While plaintiff was at the home office Iva G. Hayter interfered, by many acts, in plaintiff's discharge of his duties. Such interference consisted in opening and

answering the mail from agents of the company, much of which was addressed to plaintiff and was properly within plaintiff's department and in his line of work; in countermanding the plaintiff's orders with reference to such agents' itinerary and work; in attempting to direct the agents as to their work; in taking the agents from tasks which plaintiff had assigned to them and having such agents do other work for her; in taking the building custodian and engineer and other building employees from the National Reserve Building and assigning them other work to do for her, which employees were under the charge and direction of the plaintiff; in criticizing the plaintiff to George Godfrey Moore and to employees and subordinates. Plaintiff considered that such interference greatly reduced his efficiency, to the detriment of the interests of the company. Plaintiff on several occasions complained to his uncle George Godfrey Moore of such interference and that such conditions were growing worse, caused confusion in his department and took a great deal of his time in straightening out matters; and George Godfrey Moore assured him that it would be corrected. George Godfrey Moore stated that Miss Hayter had nothing to do with the agency department and promised to see that the interference was discontinued; but for some reason not disclosed by the evidence he did not correct the same.

### No. 14

"About the middle of December, 1935, the plaintiff resigned; and approximately on January 1, 1936, he left the employ of the company and returned to the state of California. The cause of his leaving such service was that he and his wife would rather live in California than in Kansas; that he was dissatisfied with part of the management of the company; that he was unable to get along with Iva G. Hayter, and resented the part she took in the affairs of the company. When he left Topeka he had no intention of ever returning or ever again entering the service of the company as an executive or otherwise, and this intention continued until the death of George Godfrey Moore. On arriving in California, plaintiff associated himself with the Minnesota Mutual Life Insurance Company as an agency manager, in which position he still continues.

### No. 15

"The relations between George Godfrey Moore and the plaintiff were always pleasant. George Godfrey Moore regarded plaintiff as a man of unusual ability in the insurance field. This relationship existed before and after Earle Moore returned to California, and after Earle Moore's return to California in 1936, George Godfrey Moore stated to various persons that he expected Earle Moore to return to the company and become president thereof.

### No. 16

"On or about November 22, 1938, George Godfrey Moore executed his last will and testament, wherein no devise whatsoever was made to the plaintiff, . . .

### No. 17

"At the time of the death of George Godfrey Moore he was the owner of 17,657¼ shares of the common stock of the National Reserve Life Insurance Company, . . . The legal title to Georgian Court at all times herein involved stood in the name of George Godfrey Moore, . . .

*No. 18*

"The last will and testament of George Godfrey Moore was probated on March 30, 1939. . . .

*No. 19*

"The value of the stock in the National Reserve Life Insurance Company owned by George Godfrey Moore at his death and the 40-acre tract known as Georgian Court is less than one-half of the value of the net estate of George Godfrey Moore, deceased.

.    .    .    .    .    .    .    .    .    .    .    .    .    .    .

*No. 22*

"By reason of the contract of September, 1930, plaintiff never performed any service for George Godfrey Moore personally.

*No. 23*

"The only consideration received by George Godfrey Moore personally from the plaintiff by reason of the contract of September, 1930, was whatever satisfaction he received from the fact that plaintiff would equip himself to succeed him as president of the National Reserve Life Insurance Company, and was willing to be such president.

*No. 24*

"Any damage incurred by plaintiff by reason of leaving the service of the Equitable Life Assurance Society and entering the service and working for the National Reserve Life Insurance Company from February, 1931, to January, 1936, could be ascertained and compensated for in money.

*No. 25*

"There is no evidence that the will of George Godfrey Moore, executed in the fall of 1931, was ever revoked until it was revoked by the will executed by him in November, 1938.

*Modified No. 26*

"During the years 1931, 1932, 1933, 1934 and 1935 plaintiff received for his services from the National Reserve Life Insurance Company the sum of $25,952.45, and expended for the benefit of said company $5,284.33, leaving his net earnings for the five years' service $20,668.12, or a yearly net earning of $4,133.62. During this period he received renewal commissions from the Equitable Life Assurance Society in the sum of $5,636.26, or an average of $1,127.25 per year.

*Modified No. 27*

"After leaving Topeka in January, 1936, plaintiff associated himself with the Minnesota Mutual Life Insurance Company, and in that year he received from that company $1,527.59 net, and from the Equitable Life Assurance Society renewal commissions of $615.89. In 1937 he received from the Minnesota Mutual Life Insurance Company $3,876.52 net, and also received renewals from the Equitable Life Assurance Society in the sum of $527.05. In 1938, he received from the Minnesota Mutual $4,734.56 net, and received from the Equitable renewal commissions in the sum of $321.20."

On the foregoing findings of fact the trial court reached the following conclusions of law:

### No. 1

"From the evidence adduced in the case on the question of any amount of loss or damage suffered by plaintiff by reason of his leaving the service of the Equitable Life Assurance Society and entering the service of and working for the National Reserve Life Insurance Company from February, 1931, to January, 1936, the court cannot find that it would be equitable to specifically enforce the performance of the contract of September, 1930, nor can the court find that any satisfaction George Godfrey Moore enjoyed from the fact that plaintiff entered the service of the National Reserve Life Insurance Company and from his employment in the home office of the company fitting himself to be president of the company would make it equitable to specifically enforce such contract.

### No. 2

"The conduct of plaintiff in leaving the service of the National Reserve Life Insurance Company, in January, 1936, with the intention of never again entering the employ of the company constituted an abandonment of the contract of September, 1930, on his part.

### No. 4

"Judgment should be entered for the defendants for the costs of the case."

Judgment was rendered accordingly and the plaintiff appeals, complaining chiefly of parts of findings Nos. 7 and 14; objecting to findings Nos. 22, 23 and 24; and assigning error on the trial court's conclusions of law Nos. 1, 2 and 4. Some other errors are assigned formally, but those mentioned will necessarily determine the result.

It will be noted that the trial court found that the oral contract of 1930 between uncle and nephew had in fact been made as alleged. In their counter abstract and in their briefs counsel for defendants belittle and minimize the evidence to establish that contract, and quote at length the testimony they offered to disprove its existence; but they did not except to the findings of fact, and they have brought no cross-appeal.

And *first* as to plaintiff's exception to part of finding No. 7: That finding as a whole is the one in which the trial court found that the oral contract of 1930 had been made as alleged in plaintiff's petition and as established by his evidence. The concluding lines of the finding to which the plaintiff objects read:

"It was intended by this agreement that the association of plaintiff with the National Reserve Life Insurance Company was to be permanent and to continue until the death of George Godfrey Moore or until his retirement from the presidency of the company."

Counsel for plaintiff contend that the record contains "absolutely no evidence" to support these concluding lines of finding No. 7 and that they must be interpreted as a conclusion of law which is open to appellate review.

Of some probative force on this point, it must be noted that when the uncle and nephew began their negotiations in 1930, both intended that plaintiff should operate an agency for the company in California "for several years," and then come to Topeka to serve in different managerial and executive positions. That intention had to be modified for reasons of no present importance, and the agreement became one which contemplated that plaintiff's "several years" as agency manager should be served in Kansas City instead of California. It was rather clear that when the parties opened the negotiations which culminated in the contract sued on, the elder man did not expect "to die in the harness"; he contemplated retirement from the presidency. A witness for the plaintiff, Frank L. Campbell, who was for many years clerk of the United States District Court in Topeka, testified:

"I live in Los Angeles; formerly lived in Topeka. . . . I knew Mr. Moore very well from 1906 to the time of his death. . . . We entertained each other in our homes. Our relations were intimate. My wife and I operated the Shop of India, which was located on the first floor of the National Reserve Building. Along about 1930 I had some conversations with George about Earle. . . . I asked him how he was feeling—he hadn't been feeling very well—and he said, 'Oh, kind of rotten.' I said, 'Well, George, you ought to take care of yourself, take things a little bit easier than you have.' He said, 'I am going to get things arranged some of these days so I can take it easier. I'll tell you something, Frank, I am figuring on. You know my nephew Earle. . . . I think the world of him, and Georgie does too, both Earle and his wife, and I have got this in mind. Earle is an insurance man, an awful good insurance man, a go-getter, and I am going to have him come back and be with me for a while and learn the business of the company, get acquainted with the personnel of the office, with the men outside, and meet our policy-holders, and in general make himself acquainted with the business, because he is eventually—I am going to leave my interest in the life insurance company to him. You know, I am kind of jealous about the life insurance company. I organized it and built it up, and I think I have got as good a company as there is in life insurance, and I would like to see it kept in the Moore name, want it kept in the Moore name if possible. Earle is just the fellow that I think will fit in, and I am going to have him come back and come in and stay and train him.' "

On May 1, 1930, George Godfrey Moore wrote to the plaintiff:

"You know some time or other it is going to be necessary for me to get out of the business. . . . Now what I have been wondering is if it wouldn't be

for your best interest to be associated with the N. R. L. I. Company. What would you think about coming to Topeka with the idea of working into an executive position. I mean by that to learn everything about the company, know how the business is handled on the inside and the trials and tribulations the home office man has. If you could measure up to the requirements in a reasonable time you could have the opportunity of becoming head of the company."

On December 1, 1930, plaintiff wrote to his uncle:

"In considering a change either here or to Kansas City I would like very much to make the decision and get settled as soon after January 1st as it is possible to do so."

On December 8, the uncle wrote to the nephew:

"I believe you will not have much trouble in getting started. Kansas City . . . is not a bad place to live, for after all, the next ten years or fifteen are going to be put forth in the way of making good then later on comes your play days, etc. . . . If you accept this office [offer], wish you would send me your photograph by air mail."

On December 12, the uncle again wrote:

"Would like very much to have you associated with us, but I cannot make the decision for you. It looks as though you are nicely located and it may be best for you to stay there."

In the same letter the uncle urged the financial inducements in salary and commissions which in behalf of the company he was offering to plaintiff, and added—

"You will have all the territory you can possibly handle in Kansas City, Kan., Kansas City, Mo., St. Joseph, and Independence, and if you can develop this in several years, . . . I don't know of any better opportunity for you if you make up your mind you want to leave California. Might say, there is nobody else in the world to whom I would offer such a proposition. . . . Another advantage, Earle, you would have here is being close to the home office and being familiar with everything that is going on."

When the uncle wrote these letters he was 58 years of age; his life expectancy was 14.74 years; he actually had less than 9 years to live. In the circumstances it does not seem reasonable that plaintiff's connection with his uncle's company was only to endure for such length of time as would enable him to qualify himself for the presidency of the company and that he would then be privileged to sever his connection with it until his uncle's death or resignation. Indeed, one allegation in plaintiff's petition virtually compels a contrary conclusion, where it is alleged that because of Miss Hayter's

interference with plaintiff's duties which his uncle .did not or could not terminate or prevent—

"It was then and there agreed between the plaintiff and his uncle that until it should become desirable or necessary for him to become executive head of said company, plaintiff might withdraw temporarily from the employment of the company and resume business on his own account elsewhere, but it was understood by and between them that this should not in any way violate or abrogate the original contract between the plaintiff and his uncle."

If it had not been intended in the oral argeement of uncle and nephew of 1930 that plaintiff's association with the company was to be permanent there would have been no occasion for them to make that alleged second oral agreement. Moreover, the trial court did not find that any such second agreement had been made.

In view of the correspondence and all the circumstances, this court is unable to say that the concluding sentence of finding No. 7, to which plaintiff objects, was not supported by evidence sufficient to sustain it.

Another error pressed on our attention is directed against a portion of finding No. 14, which reads:

"When he [plaintiff] left Topeka, he had no intention of ever returning or ever again entering the service of the company as an executive or otherwise, and this intention continued until the death of George Godfrey Moore."

It is contended that the excerpt just quoted was "not supported by substantial evidence and is immaterial to the issues."

Noticing the second point of objection first, the answer of defendants had specifically pleaded—

"For their second and further defense, these defendants allege that if plaintiff ever had a contract with George Godfrey Moore, as alleged in his petition, which these defendants specifically deny, said contract was breached, abandoned and renounced by plaintiff, and by reason of such breach and abandonment plaintiff is not entitled to recover in this action."

Plaintiff's reply joined issue on this plea, and its vital importance in this action is clearly evidenced by the range of testimony which centered about it at the trial below. Certainly it was material to the issues. Cases where the abandonment of a contract right has been an issue in actions for breach of contract or for specific performance are common. (*Seligman v. Rogers,* 113 Mo. 642, 21 S. W. 94; *Smedley v. Walden,* 246 Mass. 393, 400, 141 N. E. 281; *Robinett v. Hamby,* 132 N. C. 353, 43 S. E. 907; *Public Utilities Co. v. Bessemer City,* 173 N. C. 482, 485, 92 S. E. 331; *Gessler v. Erwin Co.,* 182 Wis. 315, 193 N. W. 363; *Saxlehner v. Eisner & Mendelson Co.,*

179 U. S. 19, 31, 45 L. Ed. 60; 17 C. J. S. 899; 12 Am. Jur. 1018, § 438; 25 R. C. L. 207.) In *Lohn v. Fletcher Oil Co., Inc.,* 38 Cal. App. (2d) 26, 100 P. 2d 505, the action was to obtain a declaration of the rights, duties and obligations of parties to an option to purchase oil. One of the issues raised was whether the option had been abandoned. The first section of the syllabus reads:

"Abandonment of a contract is a matter of intent and is to be ascertained from the facts and circumstances surrounding the transaction out of which the abandonment is claimed to have resulted, and it may be implied from the acts of the parties."

Did the evidence support the defendants' plea of abandonment and the trial court's finding of fact on that issue?

With a candor which we feel bound to commend, counsel for appellant say:

"We admit that there was evidence upon which the court could base his finding that when Earle left Topeka, he had no intention of ever returning and that this intention continued until the death of George Moore."

Part of that evidence was as follows: About six weeks after plaintiff severed his connection with the company and returned to California, he wrote to his uncle—

"For some reason or other I did not fit into the picture as harmoniously as was necessary for my complete happiness, and yours as well, and I do sincerely hope that I will always be able to retain your past extreme friendly interest in my welfare because regardless of what may have been said or left unsaid, I always have had a genuine respect for you. . . . It seems during my last few days in Topeka that there was some little tension and I did not have the opportunity of conveying to you personally the above sentiment."

Dr. H. B. Talbot, a Topeka physician and medical director for the company, testified that in the autumn of 1935 plaintiff told him that he wasn't satisfied with the way things were going. This testimony continues: ˎ

"He said things were just becoming impossible, so he couldn't stay and not only were things not going along like he wanted them to go but he didn't like to live in Kansas—he wasn't happy here, he didn't like this climate, he didn't like the people here. . . . Along in December, he started to talk about leaving the company again and I tried my best to get him to stay. I said, 'Earle, I think you are making the mistake of your life. We need you here. I would like to have you stay because I want you to stay and I think Mr. Moore wants you to stay.' And he said, 'Well, I can't get along with Mr. Moore, I can't get along with Miss Hayter.' . . . 'Besides,' he said, 'I don't like the state of Kansas; I don't like the weather. I wouldn't live here if my uncle would give me this company and the building and throw in the state of Kansas.' "

Within six months after leaving the company plaintiff canceled a policy of insurance he held in his uncle's company. The correspondence pertaining to it was conducted with his uncle personally.

An aunt of plaintiff, sister of George Godfrey Moore, testified that she had a conversation with plaintiff in which she asked him why he had left the National Reserve company, and that he answered her:

"Well, I knew I didn't see any future in it for me."

Her testimony continues:

"I said, 'Earle, I think you made a mistake in leaving Uncle George,' because I really had Earle's interests at heart. He said, 'Oh, no, you don't understand the life insurance game.' He said, 'Back here I can build my own future, and there,' he says, 'there was not a chance,' because, he said, that he couldn't do things the way he wanted to do them. He had new ideas and George still thought he was president of the company and . . . that they conflicted— they didn't think alike. . . . I said, 'But, Earle, I still think you should have stayed.' I told him I thought his future would have been brighter had he stayed with the National Reserve and he said, no, it wouldn't because 'now I am building a future for myself, and besides Merle and I like California to live. We intend to establish a home here and this is where we want to end our days—in California.' "

The same witness testified to another conversation she had with plaintiff after his uncle's death:

"I said to Earle Moore there, 'Earle, don't you wish you had stayed with Uncle George?' He said, 'No, I don't, Hannah. There was no future for me, and right now I wouldn't trade places with a United States senator.' "

Another witness, Doctor Kimbrough, deposed that he and his wife attended the funeral of George Godfrey Moore, and that he had a conversation with plaintiff about that time. He testified:

"I said, 'Earle, it would be a fine thing now, if you could step in here and help to handle the affairs of this insurance company.' His reply was that he had no interest in the National Reserve Life Insurance Company; he didn't want to have anything to do with it; he had his own business in California, he was making good and was happy and expected to spend the rest of his life in California. . . . Earle and his wife were preparing to leave Topeka and I asked him if he was not going to wait until George Moore's will was read. His reply was that he didn't care anything about the will, he didn't expect to benefit from it in any way whatsoever and it was not necessary for him to stay to hear it. . . . I was present at another conversation in Mr. Stone's office, between Earle Moore and Mr. Stone . . . in reference to the carrying on of the National Reserve Life Insurance Company's business. . . . Mr. Stone, in this conversation, remarked to Earle that he wished Earle could be there and help him to pull the business up and keep it on its feet. Earle replied, 'I am not interested in the National Reserve Life Insurance Company beyond the making good of some insurance which I have with the company.'

He said, 'I have no interest except my own policies and Aunt Georgie's interest in the company, and I would not take it to run it for anything. I want nothing to do with it, I have my own business in California and am making good and am happy, and expect to stay with the business I am building.' He repeated that more than once, vigorously."

Soon after plaintiff's return to California following his uncle's funeral, he wrote to another uncle by marriage:

"You don't know how glad I am that I left Topeka three years ago and am not there now. . . . It is immaterial to me as I knew quite well three years ago I was turning my back on anything that might have come to me . . . I cannot have enough faith or confidence in the company to leave any of my life insurance with them, because I want to know beyond any question of doubt that the proceeds of my life insurance will be paid to Merle and others, when I die. I don't want to have a feeling of 'lack of confidence' in the company in which I own life insurance."

The foregoing excerpts from the testimony and depositions make it clear, we think, that the criticized portion of the trial court's finding No. 14 was sufficiently sustained by the evidence. There was testimony which tended to show that George Godfrey Moore was not inclined to accept the defeat of his cherished plans to have his nephew, plaintiff herein, succeed him as president, notwithstanding the latter had severed his connection with the company. There was evidence tending to show that the elder man was deeply hurt at his nephew's departure, and that he repeatedly said to various witnesses that he could and would bring Earle back to the company. There was testimony that as late as June, 1938, and even as late as September, 1938, he still cherished that expectation, and that his will of 1931 made in conformity with his agreement with his nephew in 1930 still stood. The trial court may not have believed that testimony, or at least did not attach controlling importance to it, for it made no specific finding on the point. It was not until November 22, 1938, when George Godfrey Moore made his last will and testament, only about four months before his death, that it can be clearly inferred that the uncle had eventually given up his hope that his nephew might succeed him as head of the company. The trial court did find (F. 15) that friendly relations continued after plaintiff left the company, and that the uncle often said he "expected Earle Moore to return to the company and become president thereof." But there was no evidence that Earle "expected to return," and there was a plethora of evidence that he did not intend to return. Indeed, it would seem that plaintiff's own testimony put such an idea beyond

controversy.  The contract of 1930 between uncle and nephew had never been reduced to writing, and the latter had never heard of the rule of law that where a contract has been fully performed on one side it may be enforced in equity notwithstanding at its inception it was of the character which had to be in writing in order to bind the parties.  Having been of the opinion that his oral contract of 1930 was unenforceable in 1935 or 1936, of course plaintiff had no intention to return to the service of the company.  Never from the day he resigned from the service of the company in December, 1935, until he chanced to make contact with a lawyer several months after his uncle's death and the probate of his will, did plaintiff say or do anything to indicate an intention or disposition to return to the service of the National Reserve Life Insurance Company.  The trial court was clearly within the limits of its discretion when it declined to attach any significance to Earle Moore's evidence that if he had known the law of his case he would not have made so many and such emphatic statements to the effect that after he left the company he wanted nothing more to do with it, that he knew he was turning his back on his Kansas prospects, and that he would not stay if his uncle would give him the company and the state of Kansas to boot! Plaintiff's zealous and skillful counsel argue that these ill-advised remarks of their client merely indicate his humiliation at the way he had been "boosted out of the company," and because he "was not mentioned in the will" of his uncle.  Be that as it may, this court holds that it can find no justifiable ground to disturb the trial court's finding No. 14, nor the court's conclusion of law No. 2, which is predicated thereon.

In view of the foregoing conclusions we have been constrained to reach in respect to the errors assigned on the criticized portions of findings Nos. 7 and 14, and the trial court's conclusion No. 2, it would serve no purpose to extend this already too lengthy opinion to discuss appellant's objections to findings Nos. 22, 23 and 24, nor to adjudicate the debate between counsel touching the correctness of the trial court's conclusion No. 1.  However these might be decided, they could not affect the controlling significance attaching to findings and conclusion we have reviewed above.

No material error in the record of sufficient gravity to disturb the judgment has been made to appear, and that judgment is therefore affirmed.