[No. 1825-1.    Division One.    April 22, 1974.]

ELMER MARTINSON et al., *Respondents,* v. PUBLISHERS FOREST PRODUCTS COMPANY, *Appellant.*

*Lenihan, Ivers, Jensen & McAteer* and *Carl P. Jensen*, for appellant.

*John Ward*, for respondents.

CALLOW, J.—The plaintiffs Elmer and Cleon Martinson, who did business as Martinson Brothers Logging Company, brought an action to recover funds retained by the defendant, Publishers Forest Products Company, as a cash bond to guarantee the performance of a logging contract and other funds retained to assure construction of a spur road on the logging location. The plaintiffs claimed they partly performed the contract and then ceased performance at the request of the defendant. The defendant cross claimed alleging that the plaintiffs failed to construct roads pursuant to the contract, that the defendant never requested the plaintiffs to stop logging and that because of the plaintiffs' breach of the contract, the defendant was damaged substantially. Judgment was entered for the plaintiffs for the return of the withheld funds, and the cross claim of the defendant was dismissed. The defendant has appealed claiming the trial court erred in the entry of certain findings of fact and conclusions of law, in dismissing the defendant's cross claim and in denying the motion to dismiss the plaintiffs' case on the ground that the plaintiffs were contractors and were not licensed under RCW 18.27.

The pertinent terms of the contract which had an effective date of May 1, 1970, read as follows:

1. *Logging Operations*: The Contractor shall log and deliver to the Company all of the merchantable and otherwise usable timber . . . designated for logging by a representative of the Company (hereinafter called "Forester") on the below described land, containing ap-

proximately ....................... acres and approximately 5000 M board feed of timber: Including Pulp

. . .

2. *Term*: The term of this contract shall be from the date hereof to and including December 31, 1970.

. . .

5. *Time of Performance*: Time is the essence of this contract, and the Contractor will promptly perform each and every obligation, as hereinafter provided, and will commence active logging on said lands as soon as possible after the execution of this Contract and will carry on a continuous operation to the end that the logs to be produced hereunder will be logged and delivered within the term of this Contract.

. . .

10. *Roads and Rights-of-Way*: Unless otherwise stated under "Special Conditions," Paragraph 23 hereof, the Company will permit the Contractor to use at his own risk such existing roads and rights-of-way on its property as may be required, . . . All additional roads required shall be constructed by the Contractor at his sole expense, to specifications of location, grade, alignment and construction as may be approved by the Company.

. . .

The Company may withhold from amounts owing by it to the Contractor, as a cash bond to guarantee full and faithful performance of this contract, the sum of $.......................per 1000 lbs. or $2.00 per M board feet of logs delivered until the amount retained equals the sum of $8,000.00. Said cash bond, or so much thereof as has not otherwise been applied, shall be paid to the Contractor upon completion of this Contract satisfactory to the Company in accordance with its terms.

. . .

CONTRACTOR WILL PAY COST OF ALL SPUR ROAD CONSTRUCTION, ROAD REPAIR OF CLEARWATER ROAD, AND HIS PRORATA SHARE OF CLEARWATER ROAD MAINTENANCE, AND ORDINARY MAINTENANCE OF U. S. FOREST SERVICE MIDDLE FORK ROAD.
COMPANY WILL PAY THE COST OF CRUSHED ROCK REPLACEMENT ON FOREST SERVICE ROAD.
COMPANY SHALL WITHHOLD $5.00 PER M. ON ALL LOGS DELIVERED UNTIL SPUR ROAD CONSTRUCTION ON LOCATION APPROVED BY PUBLISHERS HAS BEEN COMPLETED.

SAID LOCATION HAS BEEN SHOWN APPROXIMATELY ON EXHIBIT "A".

The findings of the trial court reflected that the plaintiffs were not licensed or registered as contractors under RCW 18.27.

The findings further indicated that the parties entered into a written contract which required the plaintiffs to furnish all labor, material, machinery, and equipment to log, remove and deliver approximately 5 million board feet of timber from land owned by the defendant. This contract also required the plaintiffs to do such repair work on the access road to said premises as was necessary to accomplish this logging and to construct such spur roads as were necessary to log said land. The contract provided that the defendant might retain out of sums due under the contract the sum of $2 per thousand board feet until a total sum of $8,000 was accumulated, in lieu of a performance bond. The defendant accumulated $3,394.08 under this provision. The contract further provided that the defendant was authorized to withhold $5 per thousand board feet on all logs delivered until the spur road construction had been completed. Eight thousand four hundred and eighty-five dollars and twenty cents had been retained by the defendant under this provision in the contract.

The logging operation was to be supervised by Douglas Mavor, the defendant's logging manager. Ron Smith, the defendant's forestry engineer, was to lay out the spur roads to be built for access to the timber. The defendant acted through Mavor and Smith at all relevant times.

The findings also showed that the plaintiffs had inspected the road which was the access to the premises to be logged and those premises prior to the execution of the written contract. The plaintiffs repaired this access road as required by the contract. The plaintiffs commenced the required road construction in May 1970. Thereafter, logging was begun and was carried out along the access road and not along spur roads.

The trial judge found that in August or September of 1970 it became apparent to both parties that the plaintiffs could not complete the logging of the timber by December 31, 1970. Both parties testified that of the approximately 5 million board feet of timber to be logged and delivered by plaintiffs that they only logged and delivered 1.7 million board feet. It is further the undisputed testimony of the parties that the plaintiffs did not construct all of the spur roads required in order to accomplish the logging of this tract.

The finding is that Mavor had casual contact with the plaintiffs but did not complain about their logging production or road construction. It was found that during September 1970, Mavor indicated to the plaintiffs that the defendant did not want any more timber. The forestry engineer, Smith, voiced similar statements, and his assistant told plaintiffs that the defendant company did not want any more logs delivered to LaConner. The plaintiffs continued to log and deliver logs until November 24, 1970.

Continuing, the findings were that during the fall of 1970 Mavor negotiated with the plaintiffs to the effect that the plaintiffs were to commence cutting cedar poles in an area at lower elevation, and the plaintiffs were thereafter advised that they could start cutting cedar poles when they wanted to. The defendant through its forester secured a permit from the State Department of Natural Resources in early November 1970, which permit had an expiration date of December 31, 1970. The next activity with respect to the May 1970 contract was on June 4, 1971, when the attorney for the plaintiffs wrote demanding payment of the retained sums under the contract, in the total amount of $11,879.28. The defendant replied on June 7, 1971, advising that as far as the defendant knew, the plaintiffs intended to complete the contract. On July 6, 1971, the defendant wrote to the plaintiffs purporting to extend the contract to December 31, 1971. Finally, the court found that the defendant had negotiated with other loggers to complete the logging of the tract.

The assignments of error raise the following issues: (1) whether loggers are prohibited by RCW 18.27 from bringing a suit based upon a logging and road construction contract, (2) whether the dismissal of the cross claim was proper, and (3) whether the contract was mutually abandoned.

■ The plaintiffs were not required to be licensed as contractors under RCW 18.27. The purpose of the act as discussed in *Stewart v. Hammond*, 78 Wn.2d 216, 219, 471 P.2d 90 (1970), has been reaffirmed often. There the court said:

> RCW 18.27, *et seq.*, was designed to prevent the victimizing of a defenseless public by unreliable, fraudulent and incompetent contractors, many of whom operated a transient business from the relative safety of neighboring states. Public protection was sought by the registration and bonding of contractors. RCW 18.27.020-.040 inclusive. Noncompliance was discouraged by providing a criminal penalty, RCW 18.27.020, and by denying offenders access to the courts for collection of compensation for performance of work or for breach of contract. RCW 18.27.080.

*See also H.O. Meyer Drilling Co. v. Alton V. Phillips Co.*, 79 Wn.2d 431, 486 P.2d 1071 (1971); *Murphy v. Campbell Inv. Co.*, 79 Wn.2d 417, 486 P.2d 1080 (1971). It was pointed out in *Jeanneret v. Rees*, 82 Wn.2d 404, 511 P.2d 60 (1973), that a contractor could not maintain an action for compensation for the performance of any work or for the breach of any contract without alleging and proving he was duly registered and had a current valid certificate of registration unless (a) he had substantially complied with RCW 18.27 or (b) registration was not required because of one of the specific exceptions set forth in the act.

We do not find a substantial compliance with the act. The primary requirements of compliance with the act are the filing of a surety bond and registration. RCW 18.27. The chapter contains specific directives as prerequisites to registration. While the owner and the contractor secured a permit to cut timber from the supervisor of forestry (RCW 76.08

.030) and the contract provided for the withholding of sums to provide a cash bond to guarantee performance of the contract, these two circumstances are not an adequate replacement for the purposes of registration and the posting of a bond with the state under RCW 18.27. Each case must rest on its own facts and the statutory language of the registration act involved. *Northwest Cascade Constr. Inc. v. Custom Component Structures, Inc.*, 83 Wn.2d 453, 519 P.2d 1 (1974); *Stewart v. Hammond, supra.* The circumstances present do not call for an inquiry into the authorities of other states, *but see Fray v. Rogers*, 272 Cal. App. 2d 858, 77 Cal Rptr. 776 (1969); Annot., 19 A.L.R.3d 1407 (1968). The deeds of the plaintiff were insufficient substitutes for actual registration to enfold the activity in the cloak of substantial performance.

■ RCW 18.27.010 defines a contractor as any firm who or which "in the pursuit of an independent business undertakes to, . . . construct, alter, repair, . . . for another, any . . . road, . . ." The plaintiff was not required to register, however, under the exception provided by RCW 18.27.090(10) which exempts from the provisions of RCW 18.27 any construction or operation incidental to clearing or other work upon land in rural districts for fire protection purposes. The logging contract which the parties entered into on May 1, 1970, provided that the contractor agreed to comply with all laws and regulations relating to fire hazard in the conduct of these logging operations. The contract also provided that the contractor (a) agree to build all fire trails specified by the forester at his own expense, (b) construct tractor skid roads only with prior approval of the forester, (c) keep road ditching and culverts cleaned and free of obstructions, (d) perform the maintenance or repair of roads by and at the expense of the contractor to the satisfaction of the forester and to leave the roads as improved, in good condition and repair. The logging engineer for the defendant testified that the purpose of the spur roads and of the logging roads once the

logging was completed was for fire protection and management of the new stand. He further testified that some of the spur roads would be kept open for 4-wheel vehicles for fire protection after the spur roads were no longer used for logging. The primary purpose of the construction of the roads was for logging access, but an important incidental purpose was fire prevention. The plaintiff was not required to register under RCW 18.27. RCW 18.27.090 (10); *Jeanneret v. Rees, supra.*

The trial court, in addition to the findings previously recited, also found:

> The duties and obligations imposed by the contract between the parties were mutually abandoned by both parties.

The determination that a contract has been abandoned was treated as a finding of fact in *Monroe v. Fetzer,* 56 Wn.2d 39, 42, 350 P.2d 1012 (1960), which said:

> The finding of the trial court that the parties mutually abandoned the contract is supported by substantial evidence, and is in harmony with the rule that a contract will be treated as abandoned where the acts of one party inconsistent with its existence are acquiesced in by the other. *Ferris v. Blumhardt,* 48 Wn. (2d) 395, 293 P. (2d) 935 (1956); *Wiegardt v. Becken,* 21 Wn. (2d) 59, 149 P. (2d) 929 (1944).

*See also Sauder v. Dittmar,* 118 F.2d 524 (10th Cir. 1941); *In re Estate of Lyman,* 7 Wn. App. 945, 503 P.2d 1127 (1972). Whether a contract has been abandoned by the mutual consent of the parties is a finding to be made by the trial court based upon the facts and circumstances surrounding the transaction. The inquiry of the trial court is to determine what, if any, new aim and purpose the parties had in mind. As *In re Estate of Wittman,* 58 Wn.2d 841, 844, 365 P.2d 17 (1961), declared:

> An agreement of rescission must itself be a valid agreement. 12 Am. Jur. 1011, § 431. Thus, all parties to the contract must *assent* to its rescission and there must be a *meeting* of their minds. 17 C. J. S. 881, § 389. *Morango v. Phillips,* 33 Wn. (2d) 351, 205 P. (2d) 892.

The existence of abandonment depends upon intent and may be implied from the acts of the parties. *Lohn v. Fletcher Oil Co.*, 38 Cal. App. 2d 26, 100 P.2d 505 (1940); *Warren v. Gray*, 90 Ga. App. 398, 83 S.E.2d 86 (1954); *Moore v. Hayter*, 153 Kan. 1, 108 P.2d 495 (1940).

Conceptual difficulties arise from the terms employed to describe the action taken by the parties to terminate performance under a contract. The occurrence of the action is described as the occurrence of a fact; yet the finding of abandonment gives rise to a legal conclusion and result. The classification of abandonment as a finding of fact or a conclusion of law has little impact, but realizing the existence of mutual intent to discontinue performance is dispositive.

Likewise, abandonment and rescission often are alluded to as synonymous. *Jakober v. E.M. Loew's Capitol Theatre, Inc.*, 107 R.I. 104, 265 A.2d 429 (1970), held that whether a contract has been abandoned is a question of fact and then defined the terms as follows at page 111:

> In 2 Black, *Rescission of Contracts* (2d ed.) § 532, at 1306-1307, the author points out that, where a party distinctly and completely abandons all rights and obligations under a contract, the other party may assent to such an abandonment and thereby effect a rescission of the contract; or he may refuse to accept the abandonment and sue for damages because of the other party's repudiation; or he can await for the time of performance and hold the other party responsible for all the consequences of his nonperformance including a bill for specific performance. . . . rescission is something more than the termination of a contractual obligation. It seeks to create a situation as if no contract existed. . . . rescission differs from a breach of a contract by abandonment or repudiation in that to have a rescission there must be a mutuality expressed or implied. Likewise, rescission is defined in 5A Corbin, *Contracts*, § 1236, at 533, as a mutual agreement by the parties to an existing contract to discharge and terminate their duties thereunder.
>
> . . . if one of the contracting parties assents to the abandonment of the contract by the other party, there has been a rescission of the contract. Both parties are then

restored to the status they occupied prior to the contract, and neither can sue the other on the contract. . . . Abandonment, . . . is a unilateral act. Rescission is a bilateral action.

With these precepts set forth, we must determine if the record supports abandonment as a fact with substantial evidence.

It had become apparent to both parties in the late summer of 1970 that the logging on the premises described in the contract could not be completed by December 31, 1970. The agents of the defendant told the plaintiffs they did not want any more timber. By their statements and acts, the parties concurred that logging would cease in that area; and the plaintiffs phased out the logging operations under way. In the fall of 1970, Mavor negotiated with the plaintiffs to commence cutting cedar poles in an area at a lower elevation, and a permit was secured to cut timber in the new area from whence the cedar poles were to be taken. The plaintiffs transferred their operations to the new area. The securing of the first and second permit is entirely consistent with the mutual abandonment and rescission of the May 1970 agreement in November and the undertaking of the new project at that time.

The trial court could interpret the evidence thusly and hold the contract abandoned. The action of the parties in negotiating and concluding a separate agreement whereby plaintiffs were to cut cedar poles in a different location during a time period covered by the original contract, in addition to their other conduct, was inconsistent with the continued existence of the original contract. The evidence of an agreement to extend the contract is inconclusive and consists primarily of evidence that similar contracts had been extended in the past and that certain equipment had been left at the contract site. The finder of the fact could find the intent of the parties to be to mutually rescind and

52

abandon the contract. The cross claim for damages must fall in view of this result.

The judgment is affirmed.

SWANSON, C.J., and WILLIAMS, J., concur.

Petition for rehearing denied July 22, 1974.

Review denied by Supreme Court October 11, 1974.